[L. A. No. 28494.   In Bank.   Oct. 26, 1967.]

EDGAR F. ELFSTROM et al., Plaintiffs, Cross-defendants and Appellants, v. NEW YORK LIFE INSURANCE COMPANY, Defendant, Cross-complainant and Respondent.

Harney, Ford & Schlottman and Robert E. Ford for Plaintiffs, Cross-defendants and Appellants.

Meserve, Mumper & Hughes and Downey A. Grosenbaugh for Defendant, Cross-complainant and Respondent.

Chandler P. Ward as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

MOSK, J.—Edgar F. Elfstrom and the Fullerton Publishing Co., of which he is president and majority stockholder,

brought this action to recover the proceeds of a group life insurance policy issued by defendant to Elfstrom's daughter, Brenda. Defendant filed a cross-complaint asking that the certificate of life insurance issued to Brenda be rescinded. The trial court, sitting without a jury, found in favor of defendant, and this appeal ensued.

The primary issue to be decided is whether an employer (here, plaintiff and cross-defendant Fullerton Publishing Co.) who is the named insured under a group insurance policy for the benefit of its employees, acts as the agent of the employees or of the insurer in performing the functions necessary to administer the insurance provided by the policy. For the reasons discussed hereinafter, we conclude that the employer acts as the agent of the insurer in undertaking these responsibilities and that the employer's errors in administration are attributable to the insurer.

The insurance policy in question was a group policy issued to Fullerton on behalf of its employees. Fullerton paid a portion of the premiums and deducted the remainder from the wages of the insured employees. The policy provided health and life insurance benefits to stated classes of employees in specified amounts. Only those employees were covered who worked more than 32 hours a week and who had completed six months of continuous employment in an eligible class. Employees in Class C were entitled to $4,000 in life insurance benefits and were required to earn at least $200 a month.

Brenda, a student at the University of Southern California, worked for Fullerton at various times when she was not attending classes. In the spring of 1959 she was employed only occasionally and was paid a salary of $50 a month, but sometime in June of that year she began to work longer hours, and her salary was raised to $200 a month. She attended a morning class at a local college during the summer and reported for work immediately after conclusion of her class, serving six days a week. She was employed in this manner until the middle of September, when she began the fall semester at the university and thereafter worked at Fullerton only on those weekends when she was at home. After she returned to school, her salary was reduced to $100 a month.

Brenda's father was insured under the group insurance plan, and she was covered under his policy as a dependent. This status entitled her to health insurance benefits but not to life insurance coverage. Brenda was 18 years old in the summer of 1959, and under the policy she could not be carried as

a dependent when she reached the age of 19. Elfstrom was planning a European vacation and desired to put his affairs in order before leaving on the trip in September. Realizing that Brenda would become 19 in December 1959, he instructed his bookkeeper, Mrs. Sabina Still, ''to be sure that Brenda was covered while we were gone'' and ''left it to her to see that Brenda was covered.''

In August, before Elfstrom's departure, Mrs. Still informed Brenda that she was a full-time employee, that the waiting period of six months for joining the insurance plan would expire on the first day of December, and that she would then be added to the plan as an employee. Brenda signed an enrollment card provided to Fullerton by defendant. The card was entitled ''Application to New York Life Insurance Company,'' and above the signature line it stated: ''I hereby request the issuance of the insurance to which I am now entitled, or to which I may become entitled, under the terms of the group policy or policies issued to the group policyholder by the New York Life Insurance Company, and I authorize the proper deductions from my earnings as my contributions toward the cost of this insurance.''

Mrs. Still filled in the blanks on the card indicating that Brenda was earning $200 a month and was entitled to Class C coverage, and designating Elfstrom as the beneficiary. Although the record is not entirely clear, it appears that Brenda merely signed the card in blank and that the data were inserted sometime later.[1] Mrs. Still placed the card in her ''pending'' file and on November 30, 1959, she removed it from the file and inserted the date ''11/30/59.'' On that date Brenda had already returned to the university as a full-time student and her salary had been reduced to $100 a month.

On the December 1st report to defendant of the number of lives insured and the premiums paid, Mrs. Still added Brenda as an insured under the group policy. The premium for her policy was paid entirely by Fullerton. Mrs. Still also completed an insurance certificate provided by defendant, indicating the effective date of the policy as December 1, 1959, the coverage as $4,000, and the beneficiary as Elfstrom. She did not recall whether she gave the certificate to Brenda or placed it on Elfstrom's desk. Mrs. Still was familiar with the terms of the master policy at the times in question, and knew on

[1]Mrs. Still testified that Brenda signed the card ''in blank.'' It is not clear, however, whether she meant that only the date was missing at the time of Brenda's signature or whether the entire card was blank.

November 30, 1959, that Brenda was neither earning $200 a month nor working 32 hours a week.

Defendant paid $141.39 in medical benefits to Brenda during the life of the policy. She died of aplastic anemia in June 1960, and defendant refused to pay the life insurance benefits on the ground that she was not eligible for insurance under the terms of the master policy issued to Fullerton. Defendant also demanded return of the medical benefits paid under the policy and tendered back the premiums.

Plaintiffs alleged in their complaint that Mrs. Still was defendant's agent and prepared the application and certificate knowing that Brenda worked irregular hours at Fullerton and earned less than $200 a month, and that defendant's payments of medical benefits under the policy constituted a waiver of the employment and salary requirements because, assertedly, defendant knew of Brenda's employment and salary status at the time of the payments.

Defendant denied it knew Brenda was ineligible for coverage and denied Mrs. Still was its agent. By way of affirmative defense it was alleged that defendant did not know until after Brenda's death that she was ineligible for the insurance applied for and that Brenda, Elfstrom and Fullerton were aware of her ineligibility. In its cross-complaint defendant sought cancellation of the insurance certificate on the grounds that Brenda's application contained false representations and that Fullerton, Elfstrom and Brenda concealed material facts from defendant.

The trial court found that Brenda was not eligible for insurance as an employee of Fullerton at the time the policy was issued because she had not been employed for a period of six months for 32 hours a week and that she was not eligible for Class C coverage because she was not earning $200 a month. It also found that Mrs. Still was not defendant's agent, that she prepared the application form executed by Brenda, and that she knew Brenda was not earning $200 a month and was working irregular hours. According to the findings, Elfstrom and Fullerton knew when the application was made that Brenda was not earning $200 a month or working 32 hours a week and that she was not eligible for $4,000 in insurance coverage. Defendant, it was found, did not know or have reason to know the employment or salary status of Brenda. As to the cross-complaint the court found that Fullerton and Elfstrom concealed material facts from defendant. The court concluded that defendant was entitled to rescind the insurance certificate issued to Brenda.

The evidence related above is substantially without conflict and establishes, as the trial court found, that Brenda was not eligible for insurance as an employee under the group policy because she had not been employed for a period of six months for 32 hours a week. It is equally evident, however, that although Brenda signed the enrollment card she did not insert the misstatements relating to salary and coverage and that this act was performed by Mrs. Still. The record does not indicate that Brenda was aware the application contained misstatements or that she knew or suspected she was not eligible for insurance.[2]

If Mrs. Still was acting as defendant's agent in completing the application, there seems to be no doubt that as between Brenda and defendant, the latter would be held liable for Mrs. Still's conduct. (See Rest. 2d Agency, §§ 165, 282(2).)[3]

Group insurance is a relatively new social device[4] the use of which has phenomenally increased since 1945. In 1966 group life insurance alone amounted to more than 300 billion dollars in coverage and constituted 35 percent of all life

---

[2]Even if the statements that Brenda's salary was $200 a month and that she was entitled to Class C coverage were on the card when she signed it, it would not follow that she acted improperly. At the time her signature was placed on the document in August her salary was in fact $200 a month. There is no indication in the record that she knew she was not entitled to Class C coverage, or even that she knew what this meant. So far as appears, her only knowledge of the requirements for coverage were those related to her by Mrs. Still, namely, that Brenda was a full-time employee and would be eligible to join the plan in December. It should also be noted that the trial court did not find that Mrs. Still acted with fraudulent intent.

[3]Defendant cites a number of cases holding that an agent's knowledge is not imputed to his principal when the agent is acting adversely or fraudulently against the interests of his principal. (E.g., *Mutual Life Ins. Co.* v. *Hilton-Green* (1916) 241 U.S. 613, 622-623 [60 L.Ed. 1202, 1210-1211, 36 S.Ct. 676]; *Adler* v. *New York Life Ins. Co.* (8th Cir. 1929) 33 F.2d 827, 832.) These cases stand for the proposition that where the *insured* with the knowledge of the insurer's agent makes false statements or fraudulent omissions in an application, the knowledge of the agent is not imputed to his principal because the applicant is acquainted with circumstances indicating that the agent will not advise his principal of the falsity of the representations. Since there is no finding and no evidence that Brenda was aware that there were misstatements in her application, these cases and rules are inapposite in the instant matter.

[4]Modern group life insurance had its inception in 1912, when a policy was issued to Montgomery Ward & Co. on behalf of its employees. But history records much earlier macabre examples of group insurance, e.g., a policy issued in the slave trade days to indemnify the owner for the loss of slaves who might perish at sea, and a policy issued for the benefit of a shipper who insured for $15 each the lives of Chinese coolies being transported from China to Central America for the building of the Panama Canal. (Gregg, An Analysis of Group Life Insurance (1950) pp. 4-5.)

insurance in force. Eighty-five percent of the group policies written were issued to employer-employee entities. (Life Insurance Fact Book (1967) pp. 26-27.)

This type of insurance differs significantly from ordinary personal insurance. The policy is issued in the name of a group, usually an employer, which acts as a functionary in the collection and payment of premiums and in performing related duties. Most policies, such as that with which we are here concerned, require an employee to pay a portion of the premium, which the employer deducts from wages; the remainder is paid by the employer. The premiums are considerably lower than rates on policies issued on an individual basis. The insurer seldom requires a medical examination for the issuance of a policy to a member of a group, since the basic assumption is that those persons who are sufficiently healthy to be employed represent an average cross section of the population in terms of physical well-being. (See 1 Appleman, Insurance Law and Practice (1965) §§ 41, 44.)

The employer, the employee, and the insurer enjoy distinct advantages from this form of insurance. The employer, at a comparatively small cost, is enabled to reduce labor turnover and to enhance the loyalty of its employees and their families. The employee benefits by obtaining insurance at modest cost, without the necessity of a physical examination. Group insurance is profitable to the insurer because it sells policies on a mass basis at negligible per capita sales cost. Moreover, such policies show a low rate of lapse and the administration cost is minimal. (4 Encyclopedia of the Social Sciences, p. 185.)

The administration of a group policy may be handled either by the insurer itself on the basis of information furnished to it by the employer or, as in the present case, by the employer. If the insurer administers the policy, the employer periodically submits to the insurer the names of its employees and other information relevant to coverage. The preparation of accounting records and changes of beneficiary, as well as other details are handled in the insurer's offices. Ordinarily, an employee who becomes eligible for insurance is required to sign an acceptance card authorizing payroll deductions and indicating his choice of beneficiary. The company then sets up an accounting record for the employee and prepares his certificate of insurance. Other duties of administration include the termination of an em-

ployee's insurance upon notice from the employer, adjustment of benefits and premiums as the employee's classification changes, and the recording of changes of beneficiaries. (Gregg, An Analysis of Group Life Insurance, *op. cit. supra,* pp. 115-118.)

Under an employer-administered plan the employer performs these functions, sometimes resulting in a saving in premiums. The only records regularly exchanged between the employer and the insurer are those pertaining to the calculation and payment of premiums, usually in terms of the number of lives insured, the amount of insurance in force, and specification of changes. These functions are performed by the employer under the direction of the insurance company, which ordinarily provides service visits by a representative to check on the administration of the plan, examine the employer's records, lend assistance to the employer in improving administrative practices, and promote the enrollment of additional employees in the plan. (Gregg, *op. cit. supra,* at pp. 118-121.)

In the instant case, the administration of the policy was conducted by Fullerton under the direction of defendant in substantially the manner described above. Defendant provided Fullerton with a manual setting forth in minute detail the steps to be taken by it in performing such tasks as enrolling employees, adding and deleting dependents, reinstating and terminating insurance, reporting details of coverage and premiums paid to defendant, and issuing certificates of insurance provided by defendant. The employer was instructed to determine whether the employee was eligible for insurance and, if so, to fill out an enrollment card for him by inserting the class of insurance, date of employment and the employee's earnings in the blanks on the card. The employee, according to the instruction, was to provide only such details on the enrollment card as the date of his birth, his marital status, the number of his children, and the name of his beneficiary. The employer was also instructed as to the proper manner of completing the certificate issued to the individual employee.

Mrs. Still testified that she performed these tasks under the direction of an agent of defendant known as a group representative. When the group program was initiated he prepared all the enrollment cards and taught her how to complete them. Thereafter she consulted with him when any administrative problems arose and he would tell her what

she "must do." The representative made an annual review of the manner in which the policy was administered and was required to report to defendant whether the employer properly understood the coverage under the master policy, whether the administrative details were being handled properly, and whether all employees were being insured according to the provisions of the policy. The only other functions directly performed by defendant were the approval of claims submitted by employees through Mrs. Still and checking the mathematical accuracy of her monthly reports. A witness for defendant testified that where large numbers of employees are insured administration by the employer results in a cost saving to defendant but that where a small number of employees is involved a saving is not effected. He testified that Fullerton fell into the latter category.

A substantial number of cases have considered the question whether an employer acts as the agent of the insurer or of the employees in administering a policy of group insurance but their holdings are hopelessly in conflict.

A number of decisions hold that an employer acts as the agent of its employees in administering the group policy. (*Boseman* v. *Connecticut General Life Ins. Co.* (1937) 301 U.S. 196, 204-205 [81 L.Ed. 1036, 1040-1041, 57 S.Ct. 686, 110 A.L.R. 732] ; *Metropolitan Life Ins. Co.* v. *Quilty* (7th Cir. 1937) 92 F.2d 829, 832; *Leach* v. *Metropolitan Life Ins. Co.* (1927) 124 Kan. 584 [261 P. 603, 605-606] ; *Equitable Life Assur. Soc.* v. *Hall* (1934) 253 Ky. 450 [69 S.W.2d 977, 978] ; *Duval* v. *Metropolitan Life Ins. Co.* (1927) 82 N.H. 543 [136 A. 400, 403-405, 50 A.L.R. 1276] ; *Kloidt* v. *Metropolitan Life Ins. Co.* (1939) 18 N.J. Misc. 661 [16 A.2d 274, 279] ; *Hroblak* v. *Metropolitan Life Ins. Co.* (Ohio App. 1947) 79 N.E.2d 360, 364; *McFadden* v. *Equitable Life Assur. Soc.* (1945) 351 Pa. 570 [41 A.2d 624, 626].) The rationale of these cases appears to be that the employer is acting for its own benefit or for its employees in performing these tasks rather than serving the purposes of the insurer, that the real insured is the employer acting for the employees as a group, that the employer and the employees are allied in their interests, and that these interests are adverse to the insurer. (See Borst, Group Policyholder as Agent of Insurer or Group Member, 14 Federation Ins. Co. Q. Winter 1963-64, p. 11; 1 Appleman, *op. cit. supra*, at p. 55.)

Other cases have reached a contrary conclusion. (*Clauson* v. *Prudential Ins. Co. of America* (D.C. Mass. 1961) 195

F.Supp. 72, 80; *Piedmont Southern Life Ins. Co.* v. *Gunter* (1963) 108 Ga.App. 236 [132 S.E.2d 527, 530]; *Neider* v. *Continental Assur. Co.* (1948) 213 La. 621 [35 So.2d 237, 240-241, 2 A.L.R.2d 846]; *Baum* v. *Massachusetts Mut. Life Ins. Co.* (Okla. 1960) 357 P.2d 960, 964; *Coker* v. *Aetna Life Ins. Co.* (1938) 188 S.C. 472 [199 S.E. 694, 696-697].) The reasoning underlying these decisions is that the employer carries out the functions which the insurer necessarily would perform in other types of insurance and thereby confers a substantial benefit on the insurer, and that since the individual employee has no knowledge of or control over the administrative acts performed by the employer, it would be inequitable to charge him with the employer's errors. (Borst, *op. cit. supra,* at p. 11; 1 Appleman, *op. cit. supra,* at pp. 55-56.)

These conflicting views are reflected in two cases from this jurisdiction. In *Eason* v. *Aetna Life Ins. Co.* (1963) 212 Cal.App.2d 607, 611 [28 Cal.Rptr. 291], the court ruled, purportedly on the authority of *Boseman* v. *Connecticut General Life Ins. Co.* (1937) *supra,* 301 U.S. 196, that the employer was the agent of an employee for the purpose of effecting termination of the latter's group life insurance policy.[5]

*John Hancock Mut. Life Ins. Co.* v. *Dorman* (9th Cir. 1939) 108 F.2d 220, is in conflict with *Eason.* In *Hancock* the employer performed such functions as accepting insurance applications, determining the employee's eligibility, issuing certificates of insurance, and collecting the premiums. The court held that the employer was the insurer's agent in meeting these responsibilities and that acceptance of premiums by the insurer through its agent estopped the insurer from claiming that the insured was not an employee under the terms of the policy.

We are convinced that the employer is the agent of the insurer in performing the duties of administering group insurance policies. It cannot be said that the employer acts entirely for its own benefit or for the benefit of its employees in undertaking administrative functions. While a reduced premium may result if the employer relieves the insurer of

[5] *Blos* v. *Bankers Life Co.* (1955) 133 Cal.App.2d 147 [283 P.2d 744], involves a distinguishable factual situation. There, the question was not whether a grocer's association was the agent for the insurer in administering a group insurance policy but whether the association was the agent in negotiating the terms of the group policy.

these tasks, and this, of course, is advantageous to both the employer and the employees, the insurer also enjoys significant advantages from the arrangement. The reduction in the premium which results from employer-administration permits the insurer to realize a larger volume of sales, and at the same time the insurer's own administrative costs are markedly reduced.[6]

Moreover, the theory that the employer should be considered the employee's agent because the named insured under the policy is the employer rather than the individual employee falls under close scrutiny. Although the employer is the titular insured, the insurance is actually related to the life and health of the employee. Indeed, in several respects the employee is in the position of a real party to the master contract. Where he pays a portion of the premium he must volunteer to join the plan, and the premium deducted from his wages constitutes a portion of the consideration for the insurance. He may change beneficiaries as in individual insurance, and the certificate is issued by the insurer in the employee's name.

The most persuasive rationale for adopting the view that the employer acts as the agent of the insurer, however, is that the employee has no knowledge of or control over the employer's actions in handling the policy or its administration. ▮ An agency relationship is based upon consent by one person that another shall act in his behalf and be subject to his control. (*Edwards* v. *Freeman* (1949) 34 Cal.2d 589, 592 [212 P.2d 883].) It is clear from the evidence regarding procedural techniques here that the insurer-employer relationship meets this agency test with regard to the administration of the policy, whereas that between the employer and its employees fails to reflect true agency. The insurer directs the performance of the employer's administrative acts,[7] and if these duties are not undertaken properly

---

[6]As we have seen, an employee of defendant testified that defendant effected a saving where the employer-administered policy covered a larger number of employees but no saving was realized if fewer employees were insured under the policy.

[7]It may be noted that in the present case defendant, in the instruction manual provided to Fullerton, directed it to perform the very acts in question, i.e., to determine an employee's eligibility for insurance, to insert the class of coverage and the employee's salary on the enrollment card and to complete the certificate of insurance indicating the amount of coverage.

the insurer is in a position to exercise more constricted control over the employer's conduct.[8]

We are not unmindful of the fact that low administrative costs are to some extent responsible for the reduced premium rate which is the unique and valuable feature of group insurance and that closer supervision by the insurer of the employer's conduct could result in raising the cost of administration. Nevertheless, it would be inconsistent with the actual relationship of the parties and would do violence to the traditional concept of agency to hold that the employees rather than the insurer control and direct the employer's acts in administering a policy of group insurance. ■ We, therefore, disapprove the *Eason* case and conclude that Fullerton, and Mrs. Still acting for Fullerton, were defendant's agents in filling out Brenda's application and certificate and inserting the misstatements contained therein.[9]

It does not inexorably follow from this conclusion, however, that defendant is liable under the policy. ■ Elfstrom, in directing Mrs. Still to secure insurance coverage for Brenda, was not acting in the capacity of Brenda's employer but as her parent and the potential beneficiary under the policy. ■ An insurer may avoid a policy where the beneficiary misrepresents material facts in the application to the insurer. (*New York Life Ins. Co.* v. *Zivitz* (1942) 243 Ala. 379 [10 So.2d 276, 279, 143 A.L.R. 321]; *March* v. *Metropolitan Life Ins. Co.* (1898) 186 Pa. 629 [40 A. 1100, 1108]; *Gamble* v. *Metropolitan Life Ins. Co.* (1912)

---

[8]Here, defendant's group representative was specifically directed by defendant to ascertain in the course of the annual audit whether Fullerton's employees were being insured in accordance with the terms of the master policy.

[9]Amici curiae urge that ordinary agency principles should not be applied in determining whether the employer is the insurer's agent because the Legislature has undertaken to regulate the form and content of group insurance policies in the Insurance Code. (See Ins. Code, §§ 10200-10214.) However, none of these statutes is relevant to the problem of agency, with the possible exception of section 10212, which specifies that the employer is the policyholder in a policy of group insurance. As set forth above, the employee in the tripartite group insurance situation is the real insured under the policy and in several respects is in the position of a party to the insurance contract. Under these circumstances, the mere declaration in the code that the employer is the policyholder is not determinative of the agency issue. Nor does the fact that the employer may have agreed to furnish group insurance as a part of its contract with the employee militate against the conclusion that the employer acts as the insurer's agent in administering the policy. Even where such an employment agreement exists it does not relate to the question of administration of the policy and, in any event, does not persuade us that the application of recognized agency principles should be abandoned under these circumstances.

92 S.C. 451 [75 S.E. 788, 789, 41 L.R.A. N.S. 1199]; see *O'Rourke* v. *John Hancock Mut. Life Ins. Co.* (1902) 23 R.I. 457 [50 A. 834, 836, 57 L.R.A. 496]; 1 Appleman, *op. cit. supra,* p. 527.) ▮ Even though Elfstrom himself did not fill out the enrollment card, defendant would not be liable under the rationale of these cases if Elfstrom directed Mrs. Still to obtain a policy of insurance for Brenda, knowing that she was not eligible for any insurance under the group policy, or if he realized before Brenda's death that Mrs. Still, in attempting to follow his directions, had applied for a policy for which Brenda was ineligible.

▮ The findings do not grapple with the crucial issue of Elfstrom's state of mind, and the evidence would support either the conclusion that he acted innocently or that he acted with fraudulent intent. Elfstrom departed on his vacation trip on September 24, 1959, and did not return until December 9 of that year. The policy was issued while he was out of the country. As we have seen, he requested Mrs. Still to see that Brenda was insured, and he testified that he left it to Mrs. Still to see that this was done. Mrs. Still stated she never discussed Brenda's insurance certificate, which showed $4,000 coverage, with Elfstrom before Brenda's death and that she could not recall whether she gave the certificate to Elfstrom or to Brenda. According to Elfstrom, he did not see Brenda's enrollment card before her death and did not know until then that a $4,000 employee's policy had been applied for and issued to her. There can be no doubt, of course, that he knew on November 30, 1959, the day the enrollment card was completed by Mrs. Still, that Brenda was not working 32 hours a week and that she was not earning $200 a month. There is no finding that Elfstrom knew it was necessary for an employee to work 32 hours a week for a period of six months before he would be eligible for insurance under the group policy, although his knowledge of this requirement may be inferred from the evidence.

Even though Elfstrom was aware of Brenda's employment situation at the time the policy was issued and even if it be assumed that he realized she did not qualify for employee coverage under the policy, it does not necessarily follow that he acted fraudulently in procuring the insurance. There is no finding and no conclusive evidence that he knew before Brenda's death that an employee's policy for $4.000 had been applied for or issued to Brenda. A few weeks before Elfstrom's departure on vacation, he contacted defendant's group representative for the purpose of revising the policy

to raise the life insurance coverage for Fullerton's employees and to increase the insurance for officers of the company. An agreement on this subject was ostensibly reached before Elfstrom left, to be effective on October 1, 1959. Brenda had been elected an officer of Fullerton in 1958, and Elfstrom in directing Mrs. Still to procure a policy for her could have assumed she would apply for a policy in Brenda's capacity as an officer.[10]

[10]The evidence as to whether Elfstrom could have reasonably believed that Brenda was eligible for coverage as an officer is rather complex. Elfstrom did not remember whether he informed Mrs. Still before his departure that Brenda had been elected an officer the previous year and Mrs. Still testified that she did not know this, but it is not clear whether Elfstrom was aware of Mrs. Still's ignorance in this regard. During discussions in August 1959 with defendant's group representative and another insurance agent about the increase in coverage for officers, Brenda's name was not mentioned. Elfstrom did indicate that Mrs. Elfstrom was an officer and that she did not work any specified number of hours. However, no mention was made of a minimum number of working hours as a requirement for officer coverage. The amendment was to go into effect on October 1, 1959, but a rider was not prepared in time for Elfstrom to sign before he left on September 24. On September 22, Mrs. Elfstrom applied for insurance under the new officer classification, and a policy was issued to her in due course. This evidence would support a finding that prior to his departure Elfstrom could have believed that Brenda would meet the qualifications for officer coverage under the policy and that Mrs. Still would arrange for insurance on this basis.

While Elfstrom was gone, defendant questioned its group representative about the number of hours corporate officers were employed, and he replied that Mrs. Elfstrom was the only corporate officer besides Mr. Elfstrom and that she worked 20 to 40 hours a week. Mr. Elfstrom had not given the agent this information and the agent testified that he merely surmised this was the situation. Elfstrom returned to Fullerton on December 9, 1959, and on December 29 he signed a document presented to him by the group representative which amended the policy as of October 1, 1959, to show that corporate officers who worked at least 20 hours a week were to be considered full-time employees (and thereby eligible for coverage under the policy). The group representative testified that he did not discuss the question of minimum hours for officer coverage with Elfstrom. It is clear, however, that if he read the policy amendment when he signed it, he would have been aware that Brenda was not entitled to insurance as an officer. Elfstrom testified that he did not read the document because he trusted the group representative to effect the coverage agreed upon prior to his departure and that he assumed no minimum hours would be required for officers to be eligible for insurance. He also stated that he did not know of the 20-hour working requirement for officers until after Brenda's death. The trial court found that Brenda did not work 20 hours a week and that she would not have been eligible for officer coverage.

In their complaint plaintiffs alleged two causes of action based on their claim that Brenda should have been covered under the policy as an officer, and they prayed judgment for $20,000 and for reformation of the policy to eliminate the 20-hour requirement. The trial court found against them on these issues and plaintiffs have abandoned their contentions in this regard on appeal and contend only that Elfstrom is entitled to the $4,000 payment as the beneficiary under the employee's policy issued to her.

It is true, of course, that the trial court could have disbelieved Elfstrom's testimony regarding his knowledge of Brenda's insurance situation, but the findings do not indicate the court did so. The finding that Elfstrom knew Brenda was not eligible for group insurance in the sum of $4,000 when the application was made and the certificate issued is inconclusive as to whether Elfstrom acted improperly in procuring the insurance, in the absence of a finding that he knew a $4,000 employee's policy had been applied for and issued. The missing link is not supplied by the finding that Elfstrom concealed material facts from defendant, for it is not specified which facts Elfstrom concealed. Presumably the court had reference to Elfstrom's knowledge that Brenda was not earning $200 a month and was not working 32 hours a week and that she was not eligible for a $4,000 employee's policy, since these are the only matters on this subject found to be within Elfstrom's knowledge.

Under these circumstances we reverse the trial court's judgment with directions to make and enter findings as to whether Elfstrom knew at any time before Brenda's death that she did not qualify for insurance as an employee and that a $4,000 employee's policy would be or had been issued to her. The trial court is directed to enter judgment for defendant if both of these questions are answered in the affirmative. If the court finds that Elfstrom was unaware of either of these facts, it is directed to enter judgment for Elfstrom in the sum of $4,000. Each party is to bear its own costs on appeal.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.