**FIRST NATIONAL BANK OF MALDEN,**
a National Bank, Plaintiff-Appellant,

v.

**FARMERS NEW WORLD LIFE INSUR-ANCE COMPANY** and Floyd Hamp-ton, Defendants-Respondents.

No. 8885.

Springfield Court of Appeals,
Missouri.

May 25, 1970.

As Modified on Court's Own Motion and Motion for Rehearing or for Transfer to the Supreme Court Denied June 18, 1970.

O'Herin & Newberry, Malden, for plaintiff-appellant.

Jack O. Knehans, Finch, Finch, Knehans & Cochrane, Cape Girardeau, for defendant-respondent Farmers New World Life Ins. Co.

Dalton, Treasure & Bullard, Kennett, for defendant-respondent Floyd Hampton.

HOGAN, Judge.

Plaintiff, as the insured creditor under a group credit life insurance policy, made a claim for benefits upon the death of one of its debtors, a Mr. James F. King. The defendant insurer denied the claim. Plaintiff then filed this action against the insurer and its resident agent, defendant Floyd Hampton, alleging that the insurer had wrongfully denied the claim, and in a separate count that defendant Hampton had negligently failed to insure Mr. King properly, to plaintiff's detriment. A trial to the court without the intervention of a jury has resulted in a judgment against the plaintiff and in favor of both defendants, and the plaintiff appeals.

A Mr. Jim Zimmerman, executive vice-president of the plaintiff bank at the time the policy was issued, testified that the bank had difficulty in finding reasonably priced credit life policies for its debtors, particularly farmers who wanted crop loans. Since it offered level term insurance and decreasing term policies at the same rate, he decided to do business with Farmers New World. Mr. Zimmerman discussed the subject several times with the insurer's representatives—Mr. Hampton and another man whom Mr. Zimmerman remembered only as "Stan." In April 1965, Mr. Zimmerman made written application to the defendant insurer for the issuance of a creditor's group life insurance policy. The policy was issued, effective April 1, 1965.

The policy opens with the recital that " * * * [t]his Creditor's Group Life Insurance Policy No. 920185 shall be construed in accordance with the laws of Missouri, where it is delivered, and is a contract between the Company and 1st National Bank of Malden (Herein called the Creditor)." The basic insuring agreement is that "[t]he Company hereby agrees to pay to the Creditor, immediately upon receipt of due proof of the death of any debtor oc-

curring while insured hereunder, the amount for which such debtor's life is insured as determined in accordance with the terms of this Policy." Under the heading "General Provisions," it is specified that the policy " * * * and the application of the Creditor, a copy of which is attached hereto and made a part hereof, constitute the entire contract. * * *" Under the same heading, it is provided that the contract may be amended or changed without the consent of the insured debtors by written agreement between the creditor and the insurer, but the insurance provided under the policy is specifically made non-assignable.

The group requirements are stated in that part of the policy denominated "Specifications Provisions." Seven classes of debtors are listed as eligible for insurance; in the policy proper, the seventh class is denominated simply "(g) Level Term." Four classes of debtors are specifically excluded. Debtors whose indebtedness is not repayable in periodic installments are excluded, as are debtors whose indebtedness is repayable in installments over a period of more than five years. This section also specifies that "[e]xcept as provided under Grace Period-Termination of Policy, each eligible debtor will be insured automatically with respect to indebtedness contracted on or after the Date of Issue, on the date such indebtedness is contracted."[1] The plaintiff's application for the policy is attached, and there is an endorsement dated March 7, 1966, which recites that "[e]ffective March 1, 1966, the name of the Insured under Group Credit Life Policy Number 920185 is changed from the 1st National Bank of Malden to Floyd Hampton."

The plaintiff made extensive use of the policy. When a particular debtor wanted or was required to obtain coverage, the plaintiff bank prepared an individual certificate, called a "Statement of Life Insurance Protection," on a form supplied by the insurer. The debtor was not required to make any oral or written application for the coverage. Premiums were charged to the debtor and credited to the bank's "Insurance Premiums" Account. At the end of the month, the individual certificates were transmitted to Mr. Hampton with a remittance for fifty per cent of the premiums collected; the other fifty per cent was retained as a commission by the bank. Mr. Hampton then furnished the insurer with the information given him by the plaintiff, and the individual certificates were returned to the plaintiff bank. As noted, the policy was amended or modified by endorsement on March 7, 1966, to provide that Mr. Hampton, rather than the bank, was the "insured." There is no indication that a different insuring procedure was followed after the policy was so endorsed.

In the summer of 1966, Mr. King and his wife decided they wanted to buy a tract of land from Mr. Hampton and his brother, Felix. Mr. King had some net worth, but no ready cash, and the bank was hesitant to make the loan. Finally the bank agreed to lend Mr. King and his wife $7,500 with which to buy the property, on condition that Mr. King and his wife: (a) secure the loan with an additional tract of land; (b) guarantee the loan in part with a certificate of deposit for $1,000; and (c) that, as Mr. Zimmerman put it, " * * * we [plaintiff] write life insurance to cover the loan." Mr. King agreed to these terms, and on August 22, 1966, made and delivered to the plaintiff a promissory note in the amount of $7,575, payable in installments of $80 per month. The sum of $75, representing the premium charged for the life insurance, was added to the principal of the note. Then, again according to Mr. Zimmerman, "[w]e insured Mr. King for $7,-500.00 for a twelve month period beginning August 22nd, '66," and the bank then prepared an individual certificate for Mr. King. Mr. King made five payments on the

---

1. The "Grace Period-Termination of Policy" provisions have to do with termination for nonpayment of premiums, and are not material here.

note and died suddenly on January 25, 1967. Asserting that Mr. King was ineligible for insurance because his indebtedness was not repayable within five years, Farmers New World refused the plaintiff's claim for benefits. This action followed.

■ No findings of fact were requested in this case, none were made, and with deference to able counsel for the bank, he has not made his theory of liability very clear in this court. Generally, the bank's theory seems to be that Mr. King was properly included in the group insured, even though some ten years would have been required to amortize his loan and the policy specifically excludes debtors whose indebtedness is not repayable within five years. As between the bank and the defendant insurer, the essential questions tendered are questions of policy construction, and we take the case as it is presented by the appellant. It is true that this is a court-tried case, and under Rule 73.01(d), V.A.M.R., it is our duty to review the case upon both the law and the evidence, but even so we perform our appellate function only with respect to the specific matters urged by the appealing party; it is not our duty, and we will not voluntarily review the whole case on our own initiative to determine what result we would have reached if we were sitting as a trial court. Schlanger v. Simon, Mo., 339 S.W.2d 825, 828 [1–3].

The policy, though we will not set out the pertinent provisions at length, looks to the automatic insurance of all the bank's debtors whose indebtedness to the bank falls in one of seven specified categories. The criterion of insurability, in other words, is not the debtor's age or the state of his health, but the nature of his loan agreement with the bank. One of the categories listed in that part of the policy which defines insurable risks is stated simply and without qualification as "level term." The appellant bank's first briefed point is that the exclusory provision noted—prohibiting in-surance of any debtor whose indebtedness is not repayable in five years—does not apply to "level term" insurance. In arguing this point, the bank implicitly but unmistakably assumes that the master policy constituted the bank an agent for the insurer, so that it had the "right to write level term coverage on one of its borrowers." In this connection, the plaintiff draws an elaborate distinction between the types of life insurance policies which are used as credit life policies. According to the bank, and the authorities which counsel cites,[2] both "level term" policies and "decreasing term" policies are used as credit life policies. By plaintiff's definition, the words "level" (fixed) and "decreasing" refer to the benefit payable upon the insured debtor's death; therefore a "level term" policy is a life insurance policy for a specified term which pays a fixed benefit ratably to the debtor's creditor and the estate of the insured or other beneficiary if the debtor dies during the term; a "decreasing term" policy is a term policy written so that the death benefit is originally equal to the debtor's full debt, but declines as the obligation decreases through periodic installment payments. Calling our attention to Mr. Zimmerman's testimony that he was motivated to deal with Farmers New World because the insurer " * * * would offer level term insurance and reducing term insurance for the same cost," counsel asserts that the policy gave the bank the right to include Mr. King for one year because the policy at one point includes the two words "level term."

■ While some of the premises upon which plaintiff bases its argument may be true, some are definitely not, and we do not agree with plaintiff's construction of the policy or with its characterization of its "rights" thereunder. To assume that the bank had, as it maintains, the authority to accept risks, issue policies, and collect premiums would be to assume that it was a

2. See, e. g., Stewart, Credit Life—Every Man's Insurance, 35 Ins. Counsel J. 424, 425 (1968).

general agent for the insurer,[3] and neither the record nor the applicable law justifies such an assumption. Undoubtedly there are group life insurance policies which contemplate that the policyholder will act as the insurer's agent, particularly when the policyholder performs such functions as accepting applications for individual policies, determining the applicant's eligibility, issuing certificates of insurance, and collecting premiums from the individual policyholders for remission to the insurer,[4] but that is not the case here. In our case, the life of the debtor is what is insured, but in other respects the policy bears little resemblance to the ordinary life insurance policy. No application is made for an individual policy; coverage is automatic, if the debtor is eligible, when he becomes indebted to the bank. The bank is certainly not called on to determine the debtor's insurability in the usual sense, for the debtor's age and the condition of his health have nothing to do with his eligibility; that is determined by the nature of his loan contract with the bank, and regardless of the bank's actual practice, it is the bank, not the debtor, who is obligated by the policy to pay the premium charged. The insurer's contract was with the bank, not the debtors. The services performed by the bank and its officers were, in our view, mere matters of bookkeeping, and in doing whatever was necessary to obtain and keep the insurance in force, the plaintiff acted as an agent for itself or for the debtors and not as agent for the insurer. Palmer v. New-port Trust Co., Me., 245 A.2d 438, 440 [3, 4]; South Branch Valley Nat'l Bank v. Williams, 151 W.Va. 775, 155 S.E.2d 845, 848–849 [2] [3].[5] It is clear to us that if the bank had, as it maintains, a "right" to "write insurance," it was not because it was so authorized as agent for the insurer.

■ The plaintiff's further point in this respect is that the policy language is ambiguous; actually, plaintiff argues, it authorizes the issuance of "decreasing term" and "level term" insurance in the same policy, and therefore it is ambiguous, as was the policy considered in Casebolt v. Central Life Insurance Co., Mo.App., 180 S.W.2d 265. As our courts have often said, nothing is better settled than that, when the language of an insurance policy is reasonably susceptible of different constructions, the courts must adopt the construction least favorable to the insurer and most favorable to the insured, White v. Smith, Mo.App., 440 S.W.2d 497, 511 [20], but on careful examination it is apparent that the plaintiff does not really contend for an ambiguity in the usual sense of that noun. "Ambiguous," as that term is applied to the language of insurance policies and written contracts generally, means reasonably and fairly open to different constructions,[6] while the plaintiff's contention is that the words "level term" have a specific meaning as used in the policy and cannot be otherwise reasonably understood. The real question tendered by the bank's claim of

---

3. See Gaines v. Berkshire Life Ins. Co., 228 Mo.App. 319, 323, 68 S.W.2d 905, 907 [4, 5].

4. See Mutual Bank & Trust Co. v. Shaffner, Mo., 248 S.W.2d 585, 590–591 [7]; Elfstrom v. New York Life Insurance Company, 67 Cal.2d 503, 63 Cal.Rptr. 35, 40–41, 432 P.2d 731, 736–737; 1 Appleman, Insurance, § 43, pp. 54–56 (1965).

5. See also Boseman v. Connecticut General Life Insurance Company, 301 U.S. 196, 204–205, 57 S.Ct. 686, 81 L.Ed. 1036, 1041, 110 A.L.R. 732, 736–737; Couch v. Connecticut General Life Insurance Co., Fla.App., 216 So.2d 72, 73–74 [1, 2]; Prudential Insurance Co. of America v. Lancaster, 139 Ind.App. 292, 219 N.E.2d 607, 610 [5]; Rivers v. State Capital Life Insurance Company, 245 N.C. 461, 96 S.E.2d 431, 436 [2]; 1 Appleman, Insurance, § 43, pp. 54–55.

6. Spaunhorst v. Equitable Life Assur. Soc., 8 Cir., 88 F.2d 849, 850 [1]; Northern Pac. Ry. Co. v. United States, D.C. Minn., 70 F.Supp. 836, 850 [5]; State ex rel. National Life Ins. Co. v. Allen, 301 Mo. 631, 637–638, 256 S.W. 737, 739 [3]; Prentice v. Rowe, Mo.App., 324 S.W.2d 457, 464.

"ambiguity" is whether the words "level term" are used as insurance terms at all.

The language of the policy listing the insurable risks and excluding those which are uninsurable is as follows (our emphasis) :

"Debtors Eligible for Insurance. The classes of debtors eligible for insurance hereunder shall be those debtors whose indebtedness to the Creditor is of the following types:

(a) Loans made on signature of debtor only.

(b) Loans made on signature of debtor and secured by signature of one or more *co-makers or endorsers.*

(c) Loans secured by collateral.

(d) Consumer finance loans made direct with purchaser and secured by article purchased.

(e) Consumer finance loans made direct with purchaser with dealer as co-maker or endorser.

(f) Notes made by purchaser in favor of dealer and acquired by Creditor with payments made to Creditor or dealer, with *right reserved to Creditor to re-ject individual loans.*

(g) *Level Term.*

Debtors whose indebtedness to the Creditor is of any of the three following types, or of any other type not enumerated above, shall not be eligible for insurance hereunder: * * *

(2) Any indebtedness which is not repayable in periodic installments or which is repayable in periodic installments over a period of more than *five* years. * * * "

The words "level term" appear without any qualification, and perhaps if the two words are considered in isolation, their meaning is somewhat equivocal. It is elementary, however, that the meaning of particular words or phrases in insurance policies is not determined by considering the word or phrase in isolation; the policy must be read as a whole, and the meaning of words which are doubtful or obscure taken by themselves may be removed by reference to associated words. The meaning of a term may be enlarged or restricted by reference to the object of the whole clause in which it is used. This principle has a Latin name—noscitur a sociis—but it simply means that ordinarily the meaning of words is determined by considering them in context, and the rule applies to contracts and insurance policies as well as to statutes. Cochran v. Standard Acc. Ins. Co., 219 Mo.App. 322, 328–329, 271 S.W. 1011, 1013 [6] [7] ; 17A C.J.S. Contracts § 302(2), p. 149. Applying that rule here, it is apparent that the plaintiff contends for a semantic nonsequitur. Taking into account the language which leads up to and that which follows the words "level term," we would have to believe that the drafter of the policy, having enumerated six classes of indebtedness, suddenly changed the subject completely and included a technical term describing an insurance policy. To say the least, such an interpretation is strained.

There is another and perhaps stronger reason why we cannot accept the construction contended for by the plaintiff. The policy specifically makes plaintiff's written application a part of the policy; therefore, the contract between the plaintiff and the insurer consists of both documents and they must be construed together as one instrument.[7] One document may clarify the other, though in case of out-

7. State ex rel. Missouri State Life Ins. Co. v. Allen, 295 Mo. 307, 317–318, 243 S.W. 839, 842 [5] ; Lipel v. General American Life Ins. Co., Mo.App., 192 S.W.2d 871, 874–875 [1] ; Nielsen v. American Union Life Ins. Co., 236 Mo. App. 497, 502, 155 S.W.2d 515, 517 [2] ; 13 Appleman, Insurance, § 7582, pp. 334–335.

right conflict the document last integrated will control.[8] The application contains two sections which run parallel to that part of the policy we have just set forth. They are numbered 2 and 3. Each category under part 2 has a small printed box immediately preceding it, and each box is checked on the application. As material here, the application reads (our emphasis):

"2. Eligible Debtors

Only natural persons who are indebted to the Creditor as individuals, and whose indebtedness is repayable in installments and is of a type checked below, shall be eligible for insurance under the policy.

x Loans made on signature of debtor only.

x Loans made on signature of debtor and secured by signature of one or more co-makers or endorsers.

x Loans secured by collateral.

x Consumer finance loans made direct with purchaser and secured by article purchased.

x Consumer finance loans made direct with purchaser with dealer as co-maker or endorser.

x Notes made by purchaser in favor of dealer and acquired by Creditor with payments made to Creditor or dealer, with right reserved to Creditor to reject individual loans.

x *Other type(s) of indebtedness.* Describe *Level Term*

\* \* \* \* \* \*

3. Ineligible Debtors

Debtors, whose indebtedness is of a type described below, shall *not* be

eligible for insurance under the policy:

(a) any indebtedness repayable in periodic installments over a period of more than 5 years.

\* \* \*"

■ It is thus readily apparent, when the application and the policy are read together, that the words "level term" appearing in the "Specifications Provisions" do not refer to a kind of insurance policy, for while these words in the policy proper are not preceded by any qualifying language, the two words "level term" in the application are preceded by words clearly indicating that a type of indebtedness is meant. The two documents do not conflict; the application instead supplements and clarifies the policy, at least to the extent of making it clear that the words "level term" are *not* used as an insurance term.

■ To sum up our conclusions on this point, we reject the plaintiff's argument that the policy either contemplates or authorizes the issuance of "level term" insurance policies, and we hold that the policy is not ambiguous as an attempt to combine two types of insurance in one policy. Since, in our view, the bank was not and could not have been acting as the insurer's agent, there cannot be any question whether or not the bank bound the insurer by acting in excess of its actual authority, nor is it possible to say that the bank's knowledge of the King transaction should be imputed to the insurer. It may be that Mr. Zimmerman, or the bank as a corporate entity, intended at some time to enter into a contractual agreement with the insurer which would authorize the issuance of individual certificates covering otherwise uninsurable debtors on a so-called "level term" basis, but the policy which was applied for and was issued is not apt or suitable for that purpose. The governing prin-

8. Massachusetts Bonding & Insurance Co. v. Feutz, 8 Cir., 182 F.2d 752, 757 [8]; Baker v. Keet-Rountree Dry Goods Co.,

318 Mo. 969, 981, 2 S.W.2d 733, 738 [8]; 3 Corbin, Contracts, § 549, p. 188 (1960).

ciple here is that we must determine the parties' intention from the language actually used in the contract; we cannot go further and consider what they may have intended to say or how they might have said it. Community Land Corporation v. Stuenkel, Mo., 436 S.W.2d 11, 16 [4]; Brackett v. Easton Boot and Shoe Company, Mo., 388 S.W.2d 842, 847 [4]; Allen v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 460, 466 [5].

The plaintiff's theory of liability as to defendant Hampton, as articulated in its brief, is that Mr. Hampton was a dual agent for the bank and for the insurer, that he had personally inspected the individual certificate and knew that Mr. King was ineligible, and that he negligently failed to inform the bank that Mr. King could not be included in the insured group.

Here again we think the plaintiff has based its argument on certain erroneous legal and factual assumptions not supported by the record. It is argued that "there can be no question" that Mr. Hampton was the bank's agent; this argument is based in large part on the endorsement executed March 7, 1966, which purports to substitute Mr. Hampton for the bank as the "insured" under the group policy. It is not at all clear what the parties intended to accomplish by executing the endorsement. On its face, it completely substitutes Mr. Hampton for the bank as "the insured," but the policy itself does not refer to the bank as "the insured," but as "the Creditor." Taken literally, the endorsement would substitute Mr. Hampton for the bank for all purposes, and the plaintiff would have no interest whatever in the policy or its proceeds. Without being able to say confidently why the endorsement was made, we shall indulge the plaintiff's

assumption that Mr. Hampton, after March 1, 1966 (the *effective* date of the endorsement), acted as the bank's agent for certain limited purposes in the administration of the policy. All the record clearly indicates is that at the end of the month, a list of the new debtors to be included was sent to Mr. Hampton, together with that part of the premium (fifty per cent) which the bank did not retain itself, so the insurer could be advised of the new debtors included. Mr. Hampton saw the individual certificates, which were then returned to the bank.

However that may be, we are not impressed with the argument that Mr. Hampton is liable to the bank because he failed to inform it of the terms of its own policy. This case is not at all comparable to those in which an agent or broker has been held liable for his negligent failure to procure proper coverage for an individual customer, as was true in Zeff Distributing Company v. Aetna Cas. & Sur. Company, Mo., 389 S.W.2d 789, and Harris v. A. P. Nichols Inv. Co., Mo.App., 25 S.W. 2d 484, which plaintiff cites. In the first place, as we have said, this policy does not contemplate the issuance of individual policies; coverage for each individual debtor is automatic upon his becoming indebted to the bank. The group policy is the contract of insurance, and the individual certificate is merely a statement to the individual debtor that he is insured under the master policy.[9] We have doubt that the failure to issue an individual certificate, or "statement of life insurance protection," as it is called here, would affect the rights of an eligible debtor at all.[10] In the second place, the plaintiff did not employ, or even request, Mr. Hampton to procure insurance on Mr. King. The bank dealt directly with Mr. King, and prepared the individual

9. Nick v. Travelers Ins. Co., 238 Mo.App. 1181, 1200, 185 S.W.2d 326, 336, aff'd 354 Mo. 376, 189 S.W.2d 532; White v. Prudential Ins. Co. of America, 235 Mo. App. 156, 164, 127 S.W.2d 98, 102 [1]; Adair v. General American Life Ins. Co., Mo.App., 124 S.W.2d 657, 660 [2].

10. See Loubat v. Audubon Life Insurance Company, 248 La. 183, 177 So.2d 281, 284 [3]; Burns v. A. G. C., 240 Or. 95, 400 P.2d 2, 3 [1].

certificate on its own; in fact, it appears that Mr. Zimmerman took care of the matter himself. The real weakness of plaintiff's point is that it contends it should have been informed of the provisions of its own policy. The group policy was issued precisely as the bank requested in its application. It accepted the policy and made use of it. While the rule is no longer applied inflexibly, see 1 Appleman, Insurance, § 173, pp. 274–277, it is still generally true that an insured is chargeable with knowledge of the contents and legal effect of his policy,[11] and plaintiff will not be heard to say in this court that it was ignorant of the conditions and limitations of the group life policy.

 Plaintiff further contends that it should recover against the insurer because defendant Hampton, who was admittedly the insurer's agent, saw the certificate and thereby acquired knowledge that Mr. King was uninsurable, and this knowledge is imputable to the defendant insurer. It is of course true as a general rule that the knowledge of Hampton, as agent, would be imputed to his principal, the insurer, Edwards v. Zahner, Mo., 395 S.W.2d 185, 190 [5], and when the knowledge of the agent relates to a material misrepresentation or breach of warranty or condition which would otherwise render the policy unenforceable at its inception, the insurer may be estopped by the agent's knowledge from asserting such breach, or other cause of forfeiture. See, for example, Winger v. General American Life Insurance Company, Mo., 345 S.W.2d 170, 179–180 [2], and generally, 43 Am.Jur.2d Insurance, § 1064, p. 988. The difficulty here is, as was true in the *Edwards* case, *what* Mr. Hampton knew concerning Mr. King's eligibility before Mr. King was included in the group insured. It does plainly appear that Mr. Hampton was interested in the King transaction; the purchase money went to him

and his brother; they may have furnished the money for the certificate of deposit which was originally put up as collateral; and both Felix and Floyd Hampton signed a guaranty agreement which replaced the certificate of deposit. Nevertheless, we find no specific proof that Mr. Zimmerman or any one else ever told Mr. Floyd Hampton of the terms of Mr. King's loan. Mr. Zimmerman said he discussed the transaction with Mr. Felix Hampton, but there is nothing to show that defendant Floyd Hampton knew Mr. King's payments would run for more than five years, unless it can be said the individual certificate imparted that knowledge.

The only testimony concerning the practice of issuing individual certificates came from Mr. Zimmerman, who said that the original, along with perhaps thirty others, was sent to Mr. Hampton "at the end of the month." After Mr. Hampton was finished with the certificate, it was returned to the bank. To the best of Mr. Zimmerman's knowledge, Mr. Hampton was the only person connected with the insurer who ever saw the individual certificates. Mr. Hampton testified, in this connection, that he "would say" he saw Mr. King's individual certificate " * * * sometime * * between the 1st and 10th of September, '66."

The individual certificate recites (across the top) that the debtor is James F. King; that the date of the transaction is August 22, 1966; that the monthly installments are $80; that the original amount of the loan is, or was, $7,500; that the premium paid by the debtor is $75; that the term of the insurance is twelve months; and that the "expiration date" is August 22, 1967. The certificate recites that Mr. King is indebted to the plaintiff and that he has "become insured under the provisions of a Creditor's Group Life Insurance Policy issued to [the bank] by the Farmers New World

---

11. Vail v. Midland Life Ins. Co., Mo.App., 108 S.W.2d 147, 151 [4]; Buhlinger v. United Firemen's Ins. Co., Mo.App., 16 S.W.2d 699, 701 [1]; Christensen v. New York Life Ins. Co., 160 Mo.App. 486, 500, 141 S.W. 6, 10 [5]; 44 C.J.S. Insurance § 266(b), pp. 1071–1072.

Life Insurance Company, Mercer Island, Washington." The certificate also recites that " * * * the amount of insurance is limited at all times to the amount of the unpaid balance of the indebtedness on which the insurance is based * * *." We have carefully considered these recitations, but we conclude they are not sufficient to show that the terms of Mr. King's loan made him uninsurable. Installment loans are infinitely varied; some provide for a substantial initial or "down" payment; others provide for regular periodic amortization of a fixed principal amount, followed by a large "balloon" payment, usually near the maturity date of the loan, with interest rates graduated according to the serial maturities.[12] The information contained in the individual certificate is simply not sufficient to show how the King loan was to be repaid, and therefore it is insufficient to show that Mr. King was ineligible for insurance under the policy. We conclude, and hold, that the insurer was not estopped to assert that Mr. King was ineligible by reason of any knowledge Mr. Floyd Hampton was shown to have.

■ A final point to be briefly noticed is plaintiff's contention that the defense interposed by the insurer—that Mr. King was not covered by the policy—was barred because the insurer did not return "the premium received for insuring the life of James F. King." The plaintiff points out in this connection that Section 376.610,

RSMo (1959), V.A.M.S., requires that "[i]n suits brought upon life policies * * no defense based upon misrepresentation in obtaining or securing the same shall be valid, unless the defendant shall, at or before the trial, deposit in court for the benefit of the plaintiffs, the premiums received on such policies."

There is no doubt of the existence of the statute, and no question of the soundness of the salutary principle it embodies, but it has no application here. As one of several alternative defenses, the insurer pleaded that Mr. King was not covered under the master policy because his indebtedness was not repayable within five years, but it did not thereby seek to avoid the group policy; it admitted its existence and based its defense upon the policy provisions. Pleading that the particular loss resulted from an excepted risk was not an assertion that the policy was void; it was merely an assertion that there was no coverage, and the insurer was not required to return the premium to interpose that policy defense. 6 Couch on Insurance 2d, § 3:116, p. 844 (1961), and see Red Men's Fraternal Accident Ass'n of America v. Rippey, 181 Ind. 454, 103 N.E. 345, 346–347 [4], 50 L.R. A.,N.S., 1006, 1010–1011.

The judgment is not clearly erroneous for any reason briefed or developed in this court, and it is therefore affirmed.

TITUS, P. J., and STONE, J., concur.

---

12. See, e. g., Beckhart, Business Loans of American Commercial Banks, p. 208 (1959), and Munn's Encyclopedia of Banking and Finance, p. 728 (Garcia ed. 1962) describing various types of "term" loans.