[L.A. No. 29824. In Bank. Jan. 29, 1971.]

SARAH B. AMBERG, Plaintiff and Respondent, v.
BANKERS LIFE COMPANY, Defendant and Appellant.

974

## COUNSEL

Lillick, McHose, Wheat, Adams & Charles and Anthony Liebig for Defendant and Appellant.

Howard L. Winton and John D. Gray for Plaintiff and Respondent.

## OPINION

McCOMB, J.—Defendant appeals from a judgment in favor of plaintiff in an action to recover under a group life insurance policy.

*Facts:* Plaintiff is the widow of Roland Amberg. From 1959 to January 29, 1964, Amberg owned 50 percent of the stock of Roland Oldsmobile (later renamed Jim Kresl Oldsmobile) and was its president. On January 29, 1964, Amberg sold his stock to his partner, James Kresl. At that time, Amberg ceased to be an officer of the company, but he agreed to serve as a consultant for the remainder of the year.[1] On April 14, 1964, Amberg died.

Westland Associates (hereinafter referred to as "Westland") was a "buying organization" for about 30 automobile dealers, including Roland Oldsmobile. Among other things, it bought group insurance for its member dealers and their employees. Beginning January 1, 1960, and continuing through March 31, 1964, Union Central Life Insurance Company (hereinafter referred to as "Union Central") was the insurer of the

---

[1]On January 24, 1964, according to the minutes of the board of directors of Roland Oldsmobile, Amberg resigned as president, Kresl was elected to replace him, and Amberg was elected vice-president. But the minutes were unsigned, and the trial court found that Amberg was not an officer after January 1964. However, Amberg performed the same functions for the company, and received the same compensation, as he had while president and half owner.

Westland group, including Roland Oldsmobile. Under the policy, there were various classification provisions. One designation was for an "executive group," consisting of actively employed proprietors, partners, and officers of the company, eligible for $40,000 life insurance, the maximum coverage.

At the end of 1963 or early in 1964, Westland and defendant began negotiations for the latter to become the insurer under Westland's group life insurance program, the intention being that defendant's policy would contain the same provisions as the Union Central policy. During the course of the negotiations, Westland supplied defendant with a list of persons insured under the Union Central policy as of January 20, 1964, including Amberg with $40,000 coverage. The list was given to defendant so that it could calculate the rate at which it was willing to take over the insurance.

Thereafter, defendant's representatives and Westland's insurance fund trustees discussed the criteria for eligibility; and defendant agreed on or about February 26, 1964, that coverage would be determined by Union Central's enrollment cards then on file at Westland's office.[2] At that time, it was apparently intended that the policy would become effective March 1, 1964. The actual effective date, however, was April 1, 1964; and at the trial Mr. Handschuch, defendant's regional group and pension manager, testified that it was agreed the persons initially insured would be determined by the enrollment cards as they existed on that date.

In the application for group insurance filed with defendant March 11, 1964, it was stated that the persons eligible were "All persons insured under executive life program"; and in a letter to Roland Oldsmobile, dated March 31, 1964, Westland stated that the group policy was being "taken over" by defendant from Union Central and that there would be "no difference in the rates, certificate numbers, coverage or billing procedure." A copy of the letter was sent to the insurance broker handling the transaction and to Mr. Handschuch. No question was raised by defendant with respect to any of the statements in the letter.

Neither Amberg nor Kresl ever took part in the administration of the

---

[2]On February 26, 1964, in an inter-office memorandum, defendant's regional group and pension manager wrote: ". . . we will have to parallel the same coverage as Union Central.

". . . . One final comment on the life insurance it was agreed that we will accept the Union Central cards which Westland has in their files currently with beneficiaries correct but will insist upon new entrants completing a Bankers Life card. I definitely feel as if I can get the existing cards filled out on a Bankers Life form within six months by asking them to check the beneficiary and sign it."

group policy with either Union Central or defendant. This work on behalf of Roland Oldsmobile was performed by Mrs. Muller, its office manager, and by Westland. Mrs. Muller deducted the premium contributions from the employees' pay checks, enrolled new employees in the group plan, reported changes in classifications and terminations of employment, filed periodic reports, and remitted monthly premiums to Westland for forwarding to the insurance carrier. Westland maintained records and remitted the premiums to the insurer with a recapitulation sheet covering all its dealers.

On April 6, 1964, defendant forwarded to Westland by air express 700 copies of the certificates to be distributed to the persons insured. (See Ins. Code, § 10209.) Prior to distribution, Westland, with defendant's approval, numbered them and completed them by filling in the names of the individual insureds and their beneficiaries.[3] At the trial, plaintiff introduced in evidence one such certificate, numbered 18001 and showing Amberg as the insured and plaintiff as his beneficiary.

As hereinabove indicated, Amberg died April 14, 1964. On April 27, 1964, defendant's regional claims supervisor wrote a memorandum to the file reporting Amberg's death, expressing the opinion that there was doubt that Amberg was covered under the policy, and recommending that nothing be done at that time, in the hope that Amberg's beneficiary would conclude that as a result of his having sold his stock he had no coverage. Defendant nevertheless retained the premium paid to it for Amberg's $40,000 life insurance coverage and at no time suggested that there should be any adjustment with respect thereto.[4]

Thereafter, plaintiff applied to defendant for the $40,000 benefit, but her claim was denied. In rejecting plaintiff's claim for the $40,000 benefit,

[3]Mr. Handschuch testified: "Q. Then your belief . . . is that Westland [filled] in the names of the policyholder and the beneficiary and the certificate number; is that correct? A. Yes, because they were the only ones that had the certificate numbers. Q. That was perfectly fine with [defendant], that Westland was so proceeding, wasn't it? A. Yes, sir."

[4]The last premium for Amberg's coverage was forwarded to Westland May 7, 1964, with the report due May 1, 1964. The remittance forwarded with the May 1 report apparently covered premiums due for coverage during April, the reporter's transcript showing the following colloquy between the trial judge and defense counsel: "THE COURT: Where did the April 1st list go? MR. LIEBIG: That was in the administration of the Union Central policy because that had to do with the premiums paid Union Central for the last month of their coverage. THE COURT: Premiums are paid in advance, aren't they? MR. LIEBIG: They weren't in this situation because the evidence is that ordinarily when you get the thing going you pay the premium on the 1st and you adjust at the end. Here they didn't even get the reports back to Westland until May as to who was covered during that first month."

however, defendant did not contend that Amberg was not covered under the policy. It contended only that his coverage was limited to a $5,000 benefit.[5]

The record contains copies of the monthly reports which had been prepared by Mrs. Muller as of January 1, February 1, March 1, April 1, and May 1, 1964, and forwarded to Westland with Roland Oldsmobile's checks for the amounts shown to be due. In each instance, the amount forwarded included an amount deducted from Amberg's compensation computed on the basis of $40,000 coverage. Although Mrs. Muller knew that after January 29, 1964, Amberg was no longer president or a part owner, no change was made on his enrollment card, and in her reports to Westland Mrs. Muller continued to report his coverage in the same manner as before, because she observed that he was doing substantially the same work, and she believed his classification remained the same.

After plaintiff's claim was denied, she brought this action and recovered judgment for $40,000, plus interest of $14,000 (computed at 7 percent from August 20, 1964, the date defendant rejected plaintiff's claim), or a total of $54,000.

It is undisputed that Amberg, at the time he ceased to be an officer of the company (January 29, 1964), ceased to be eligible for insurance coverage within the "executive group" at $40,000 under Union Central's policy and subsequently under defendant's policy. The trial court, however, predicated its judgment for plaintiff on principles of agency, finding that Westland and Roland Oldsmobile, in administering the group life insurance program, were acting as defendant's agents. Accordingly, the trial court concluded that the error in including Amberg in the $40,000 insured group obligated defendant to pay on that basis, there being no fraudulent intent in including Amberg in such group.

**■** Question: *Is defendant bound by the error in including Amberg in the $40,000 insured group?*

*Yes.* Throughout the administration of the entire group life insurance program, first with Union Central and later with defendant, the insurer relied upon Westland and Roland Oldsmobile to determine eligibility of the employees for coverage.[6] The enrollment cards as they existed on April

---

[5]Defendant wrote plaintiff, as follows: "We have completed our investigation with respect to your deceased husband's claim.

"Your husband's duties as a consultant while his insurance was in force under Group Policy GL 5027 entitled him to an insurance benefit of $5,000."

[6]Mr. Handschuch testified: "Q. Month by month who determines the eligibility and the classification? A. The contract. Q. Who makes the determination month by

1, 1964, as well as the list previously furnished defendant by Westland showing the persons insured under the Union Central policy, indicated that Amberg was eligible for $40,000 coverage[7]; and it is clear that defendant agreed to accept the enrollment cards as maintained by Westland and Roland Oldsmobile on April 1, 1964, and give the same coverage as Union Central had.[8] It is also clear that defendant relied on Westland and Roland Oldsmobile to keep the enrollment cards up to date.

month as to whether there should be a change under the terms of the contract? A. The policyholder would. Q. Westland Associates in this instance? A. Yes, in part upon direction of each participating unit telling them if this man is in or out. Q. In this case Roland Oldsmobile? A. Yes."

Mr. Handschuch further testified: "Q. You relied on the work that Westland did; isn't that true? A. Yes, sir." He further testified: "You relied on the list of names, the amounts and the birth dates that had been submitted to you by Westland; is that a fair statement? A. Yes, sir." Additionally, he testified: "Q. Then just to conclude, in the going forward with this coverage you relied on the lists that were submitted to you by Westland Associates; is that correct? A. Yes, sir."

Furthermore, in the February 26 memorandum referred to above, Mr. Handschuch stated, "Concerning the administration, Westland solely handles the Union Central program in a very competent manner;" thus indicating a willingness to rely on Westland to handle all details of the administration of the program, presumably including the determination of eligibility.

[7] The enrollment cards were not introduced into evidence. However, the reports submitted each month were supposed to reflect any changes in enrollment; and, as hereinabove indicated, no change in Amberg's status was shown on the reports.

[8] Mr. Handschuch testified, as follows: "Q. . . . Now, isn't it a fact that when [defendant] committed the coverage to Westland Associates and their participating units that [defendant] knew that they were taking over on the exact same basis of rates, certificate numbers, coverage and billing procedure as had been followed for some four or five years by Union Central Life Company? A. Yes."

He further testified: "Q. . . . Once receiving that [the list of insureds under Union Central's policy] from Westland you accepted it for purposes of the change-over from the former coverage to [defendant], didn't you? A. Yes. Q. All right. And you didn't request any new enrollment cards or any new information as to those persons set forth on the lists you received from Westland; isn't that true? A. No other information, no, sir. Q. All right. As a matter of fact, you knew and planned that as for later entrance into the group coverage, then you would want new enrollment cards; is that correct? A. Yes, sir. Q. And you had in your file under date of March 17th a letter that you wrote to Mr. Ray Crabtree of the Group Underwriting Division, a letter that you wrote, indicating that as to anyone new there would be new enrollment cards? A. Correct. Q. But only as to anyone new; is that correct? A. Yes, sir."

On redirect examination, Mr. Handschuch testified: "Q. Mr. Handschuch, Mr. Liebig [defendant's attorney] asked you some question relating to the status of the insurance as of April 1st, 1964, when it went into effect. So that I am clear on it and so that the record is clear on it, on April 1st, 1964, there was in full force and effect the group life insurance policy under which this lawsuit is proceeding; isn't that true? A. That is correct. Q. All right. And since you had not yet—and I believe your exact language was that in the essence of time to get them out you were going to reproduce the Union Central booklets, and since you had not yet gotten back any enrollment cards of your own, you were using and relying on the enrollment cards that existed at that time, the Union Central enrollment cards; is that true? A. That is correct. Q. So in colloquial language, as of April 1st [defendant] had made a deal to insure each and every one of those persons who was carried under the Union Central enrollment cards? A. Yes."

Thus, under the unanimous holding of this court in *Elfstrom* v. *New York Life Ins. Co.*, 67 Cal.2d 503 [63 Cal.Rptr. 35, 432 P.2d 731], defendant is bound by the error in including Amberg in the $40,000 insured group. In *Elfstrom*, the plaintiff was president of the employer (Fullerton Publishing Co.) and the father of the deceased employee (Brenda), as well as the beneficiary under his daughter's insurance certificate. Fullerton's bookkeeper, Mrs. Still, administered the group policy. She mistakenly included Brenda as an insured in monthly reports to defendant insurer when, in fact, Brenda was not eligible, because her employment at the minimum salary required had terminated before expiration of the waiting period necessary for coverage. The premiums were paid until Brenda's death, seven months after expiration of the waiting period. Under these facts, it was held that the duties of the employer, discharged by Mrs. Still, in administering the group life insurance policy, made it the agent of defendant insurer, and that the insurer was bound by the mistakes of the employer (per Mrs. Still) acting within the scope of the agency, provided the plaintiff (beneficiary) was acting in good faith in directing her to effect coverage for Brenda.

Defendant's policy provided, among other things: "Clerical error on the part of the Group Policyholder in furnishing such information [necessary to administer the policy] shall not invalidate insurance otherwise in force, *nor continue insurance otherwise terminated.*" (Italics added.) Defendant argues that, as a result, once an insured in fact became ineligible according to the terms of the contract, he was automatically without that insurance coverage unless defendant by its conduct had led the insured to believe he was still covered. As hereinabove indicated, however, the record clearly shows that Westland had the duty of administering the policy upon the direction of the participating units, and that under such administration Amberg's $40,000 coverage was continued.

Although the record does not show when Amberg's certificate was filled in by Westland, it may be inferred, since the blank certificates were forwarded to Westland by air express April 6, 1964, that the certificate was completed prior to April 14, 1964, the date of Amberg's death. In any event, however, whether the certificate was completed a few days before his death or shortly afterwards would have significance only as the juxtaposition of those events might bear on the question of fraud; and the trial court found that there had been no fraudulent intent in reporting that Amberg was insured for $40,000.

The trial court found that Amberg received no notification from defendant, Union Central, Roland Oldsmobile, or Westland that his coverage had been terminated or changed in any way. As pointed out by the

trial court, it is clear that the intent of all parties was that Amberg have the $40,000 coverage, and that if the point had been raised, it would have been a simple enough matter to comply with the technicalities required to continue his eligibility.[9]

Under all the circumstances, there being no basis for concluding that a fraudulent intent existed on the part of anyone concerned, defendant is bound by the enrollment cards as maintained by Westland and Roland Oldsmobile and is liable to plaintiff under the policy, as found by the trial court.

The judgment is affirmed.

Wright, C. J. Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[9]Thus, the trial court stated: "If the parties had actually been aware of the technicalities of the classifications, they could have seen to it that Mr. Amberg was duly elected and so shown in the Minutes as vice president, because his intention is clear; he was carried on as an executive of the company even though in fact apparently he was not, and he paid his premiums for those months, so it was certainly the intention of everybody connected with the Kresl company that he be covered in the same manner as he had been theretofore.

"If there was some technical reason why he was not eligible, they could have cured that by calling another director's [sic] meeting and making him vice president."