[S.F. No. 23057. In Bank. Feb. 19, 1974.]

BELVA BASS, Plaintiff and Appellant, v.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY,
Defendant and Respondent.

## COUNSEL

Thorne, Clopton, Herz & Stanek and Richard W. Herz for Plaintiff and Appellant.

Bohnett, Bohnett & Weber and Michael C. Weber for Defendant and Respondent.

## OPINION

**BURKE, J.**—In this case we discuss the responsibility of an employer and its group insurer toward employees entitled to coverage under group disability and life insurance programs negotiated by employee labor unions. Here, decedent J. T. Bass evidently waived coverage under a 1964 group plan offered by his employer, Ford Motor Company, despite the fact that such insurance was offered free of charge to all employees.

The question presented herein is whether Ford, and defendant insurer, John Hancock Mutual Life Insurance Company, were entitled to rely upon that waiver as a continuing one, effectively relieving Hancock of liability under a subsequent 1967 group plan as to which decedent was not consulted. We have concluded that Bass must be deemed to have been covered by the 1967 plan and that defendant Hancock should be held liable under the group policy to plaintiff, Bass' surviving spouse.

Decedent Bass was employed by Ford during the entire period from 1947 to his death in 1968. Prior to 1964, Ford offered to its employees a voluntary group plan written by Hancock whereby disability insurance, supplemental to existing mandatory state disability insurance, was available upon payment by the employee of an additional premium. If an employee desired such supplemental insurance, Ford's custom was to have the employee sign an application therefor. Bass had refused to participate in this contributory plan.

In October 1964, as a result of labor negotiations with Ford, the existing Hancock group plan was amended to provide for disability and

life benefits *without charge* to the employee. Ford sent a letter to all employees not previously enrolled in the Hancock program explaining the new benefits. Ford also directed its various supervisors to solicit personally each employee who had neither participated in the former contributory plan nor responded to the information letter.

Accordingly, in 1964 Bass was solicited upon three different occasions by Ford representatives, who urged and encouraged him to apply for the Hancock coverage. Although the record is not clear on the question, we may reasonably assume that Bass was told of the various benefits provided and of the fact that the insurance was free of charge. Bass, however, adamantly refused to apply and wrote across the copy of the application furnished to him the words "I don't want."[1] Thereafter, Bass continued to be covered by the state disability plan for which a salary deduction was made.

In October 1967, the Ford union contract was renegotiated, as was customary every three years. As part of the new contract, the Hancock plan was amended once more to provide for increased benefits. Although three years had passed since Bass had refused coverage, neither Ford nor Hancock solicited Bass' desires with respect to the 1967 plan. Instead, Ford distributed to all its employees, including Bass, an information booklet explaining the new coverage and the benefits provided. The booklet, conceded at oral argument to have been prepared by Hancock, stated that "This Certificate-Booklet becomes applicable to you on October 25, 1967 if you are then at work, otherwise on the first day worked thereafter." The booklet made no mention of any necessity for applying for coverage under the plan. Indeed, under the heading "Who is eligible for the Program," the booklet states "The Life and Disability Insurance Program is available to you if you are a regular full-time employee of the Ford Motor Company represented by the UAW under the Collective Bargaining Agreement dated October 25, 1967." Plaintiff testified that she and Bass read the booklet and were "happy" that they were covered by the 1967 plan.

Bass died in 1968 in a car accident. Plaintiff brought this action against defendant Hancock to recover benefits assertedly payable under the 1967 group plan. She waived jury trial and the trial court entered judgment in Hancock's favor. The court found that Bass "had a choice, he could accept or refuse insurance coverage," and that Bass chose to refuse coverage. The court also found that since Ford paid no premiums to Han-

---

[1]Bass was the *only* one of some 3,500 employees of the Ford San Jose plant who refused the 1964 coverage. The evidence does not explain the reason for Bass' refusal.

cock to insure Bass, Hancock would have no liability in any event. Plaintiff appeals.

### 1. *Bass' waiver of coverage*

█ It seems evident to us that a waiver which occurred in 1964 is not necessarily controlling with respect to rights under a 1967 insurance program. Traditional legal principles convince us that the trial court erred in concluding otherwise. Bass was a third party beneficiary under the Ford-UAW union contract and the Ford-Hancock group insurance program, and as such he initially acquired valuable rights to insurance coverage. (See Civ. Code, § 1559; *Reynolds Elec. etc. Co.* v. *Workman's Comp. App. Bd.,* 65 Cal.2d 429, 433 [55 Cal.Rptr. 248, 421 P.2d 96] [labor union contract]; *Johnson* v. *Holmes Tuttle Lincoln-Merc.,* 160 Cal.App.2d 290, 296-298 [325 P.2d 193] [liability insurance contract].)
█ Although the rights of a third party beneficiary may be voluntarily waived or disclaimed (*Stanley* v. *Robert S. Odell and Co.,* 97 Cal.App.2d 521, 533-534 [218 P.2d 162]), the burden is on the party claiming the waiver ". . . to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver' [citation]." (*City of Ukiah* v. *Fones,* 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369]; *Humphrey* v. *Equitable Life Assur. Soc.,* 67 Cal.2d 527, 535 [63 Cal.Rptr. 50, 432 P.2d 746] [group disability and life policy].)

█ We may assume that the contract rights which Bass acquired under the 1964 insurance program were, as the trial court found, unequivocally and voluntarily waived or disclaimed by him. Yet the record contains no evidence whatever that Bass subsequently relinquished the new rights to coverage which accrued to him in 1967 by reason of the renegotiation of Ford's labor contract and the amendment of the Hancock group plan.[2] True, one might assume that Bass, having refused free

---

[2] The language of the informational booklet distributed to Ford employees (and certified as accurate by Hancock) reinforces our conclusion that the 1967 plan was an entirely new arrangement unaffected by a prior waiver. The booklet, in addition to stating that it "becomes applicable to you on October 25, 1967" also provided that "When this Certificate-Booklet becomes applicable to you, it supersedes, replaces and makes void any and all certificates and supplements thereto that may have been previously issued to you describing the Life and Disability Insurance Program." As Bass had, on at least three prior occasions, been instructed to write "Do not want" upon applications for coverage under prior plans rejected by him, Bass could reasonably assume that he was covered by the 1967 plan in the absence of executing a similar rejection. For cases discussing the effect of statements made in informational booklets to employees regarding group insurance coverage, see Annot., 36 A.L.R.3d 541; see also *Humphrey* v. *Equitable Life Assur. Soc., supra,* 67 Cal.2d 527, 532-535.

insurance coverage under the 1964 plan, probably would have also refused similar coverage under the amended 1967 plan. Yet we can as easily assume that Bass finally appreciated the benefits of the Hancock plan and, as his wife testified, was "happy" to be covered by it. ■ As we pointed out in *City of Ukiah* v. *Fones, supra,* 64 Cal.2d 104, 108, ". . . the very necessity of such speculation demonstrates that the . . . proof of waiver is not 'clear and convincing' within the meaning of the cases . . . ." ■ We note that it would have been a simple matter for Ford or Hancock to solicit Bass' desires on the matter of the 1967 plan, as had been done in 1964. Yet in the absence of a renewed rejection or disclaimer from Bass, or other "clear and convincing" indicium of waiver, we must conclude that Bass retained his group insurance rights under the 1967 plan.[3]

## 2. *Hancock's liability to plaintiff*

■ Defendant Hancock contends that even if Bass did not waive his rights to coverage, plaintiff's cause of action would be against Ford rather than Hancock, since Ford paid Hancock no premiums on Bass' account. To the contrary, nonpayment of premiums may have constituted a breach of *Ford's* obligations to Hancock, but would not affect the right of Bass (or plaintiff) to enforce coverage which Hancock agreed to extend to *all* Ford employees.[4] In a series of recent cases we have held that the employer is the agent of the insurer in performing the duties of administering group insurance policies, including the payment of premiums, and that accordingly the insurer shares responsibility for the employer's mistakes.

---

[3] Although the cases suggest that the beneficiary of a third party beneficiary contract ordinarily must signify his acceptance of the "offer" represented by that contract (see *Bogart* v. *George K. Porter Co.,* 193 Cal. 197, 207 [223 P. 959, 31 A.L.R. 1045]; 12 Cal.Jur.2d, Contracts, § 265, and cases cited), we think the instant case presents a situation excusing compliance with that rule. Both the 1967 Ford-UAW contract and the 1967 Ford-Hancock plan were self-executing in the sense that they contemplated automatic coverage for all Ford employees; neither the contract nor the plan (as described in the informational booklet distributed to Ford employees) required employees to make formal application for coverage. Under these circumstances, acceptance of Ford's "offer" would have been an idle and unnecessary act.

Defendant points out that under the 1967 master policy itself, reference is made to a "written application" required of certain Ford employees. The record discloses, however, that neither defendant nor Ford tendered any application form to Bass or otherwise solicited his desires in the matter. Neither the 1967 Ford labor contract nor the informational booklet refers to any requirement that an application be filed, and it would appear unjust to charge Bass with knowledge of provisions in a master policy which was never submitted to him.

[4] The textwriters agree that an employee who otherwise satisfies the conditions of a group plan may maintain an action against the insurer as a third party beneficiary. (See 2 Williston, Contracts (3d ed.) § 369, pp. 906-907; 4 Corbin, Contracts, § 807, p. 213.) The same reasoning would apply, of course, to the employee's beneficiaries.

(*Elfstrom* v. *New York Life Ins. Co.,* 67 Cal.2d 503 [63 Cal.Rptr. 35, 432 P.2d 731]; *Amberg* v. *Bankers Life Co.,* 3 Cal.3d 973 [92 Cal.Rptr. 273, 479 P.2d 633]; *Bareno* v. *Employers Life Ins. Co.,* 7 Cal.3d 875 [103 Cal.Rptr. 865, 500 P.2d 889].) We see no reason to deviate from this principle in the instant case. Indeed, we note that Hancock's own representative admitted at trial that if a Ford employee were not included in the calculation of premiums by reason of clerical error or mistake, Hancock would nevertheless honor his claim under the group policy and back-charge Ford for the unpaid premiums.

In the instant case, Ford's "mistake" was in assuming that Bass had rejected coverage under the 1967 group plan, without verifying that fact with Bass himself. We think that this kind of mistake is one for which Hancock should share responsibility despite the nonpayment of premiums.

The judgment is reversed and the cause remanded to the trial court with directions to calculate the amount owing to plaintiff under the subject policy and to enter judgment in plaintiff's favor for such amount.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Clark, J., concurred.