[S.F. No. 24306. Oct. 28, 1982.]

METROPOLITAN LIFE INSURANCE COMPANY,
Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

650

## COUNSEL

George Deukmejian, Attorney General, and Timothy G. Laddish, Deputy Attorney General, for Defendant and Appellant.

Hart H. Spiegel, Robert S. Daggett, Donald J. Heng, Jr., Brobeck, Phleger & Harrison and Gerard J. Talbot for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—The California Constitution imposes a franchise tax "on each insurer doing business in this state," measured by the amount of "gross premiums" which the insurer receives in a particular year. (Cal. Const., art. XIII, § 28 (formerly § 14⅘); see also Rev. & Tax. Code, §§ 12201, 12221.) We must decide whether certain amounts, though never formally paid to Metropolitan Life Insurance Company (Metropolitan), nevertheless are to be included within the gross premiums measure of the tax imposed on its business done in California.

Metropolitan writes coverage for employee group medical benefit plans. Prior to 1967, employers financed the entire cost of such coverage through monthly premiums paid to Metropolitan, which paid a premiums tax on the total amount received. With respect to the benefit plans for 15 large employers, however, Metropolitan has devised a new arrangement in which it claims to have shifted 90 percent of the obligation for medical benefit coverage to the employers and thereby reduced by 90 percent the gross premiums received from those employers, reducing its premiums tax liability accordingly. Because we conclude that under the new arrangement the employer is a mere agent of Metropolitan for collection of premiums, not an independent insurer, we attribute the entire cost of the group plan to Metropolitan's gross premiums and reverse the trial court's judgment granting a tax refund to Metropolitan.

Before 1967, when it began offering the "Mini-Met" plan which is the subject of the instant controversy, Metropolitan offered employers a plan denominated the standard group policy. According to the terms of such policies, the employers paid a premium in return for Metropolitan's assumption of the entire obligation to provide health coverage to benefitted employees. The premiums for the standard policies represented the entire cost of the agreed-upon coverage, and Metropolitan paid a tax calculated as a percentage of the total premiums it received.

The arrangements here at issue represent an alteration of Metropolitan's standard group policies. Under the standard plans, Metropolitan retained the benefit of the "float"—the use of premium funds from the time of payment until the funds were disbursed to satisfy claims. In addition, Metropolitan apparently passed through to the employers, as an element of premiums, the amount of its premiums tax liability. Motivated by a desire to reduce the cost of insurance coverage and to obtain an improved cash-flow situation, the employers persuaded Metropolitan to modify its group insurance coverage. Metropolitan obliged by developing the Mini-Met rider to the standard group policy. The rider shifted certain cash-flow advantages to the employers and sought to substantially reduce Metropolitan's premiums tax liability.

The Mini-Met rider required employers to assume the obligation to pay all employee claims for benefits up to a "trigger-point" amount, defined as the actuarially predicted, monthly average level of aggregate employee claims. Metropolitan remained obligated to pay all claims in excess of that amount. Because Metropolitan was primarily obligated to pay employee claims only after the trigger point was reached for a particular month, it charged the employers a premium reduced by 90 percent. Hence, rather than paying a single premium to Metropolitan as they had previously done, the employers who elected to adopt the Mini-Met rider paid pretrigger-point claims directly to the employees and paid the smaller premium to Metropolitan.

The employers obtained cash-flow benefits from the modified arrangement, since they had the use of their funds until claims were actually paid out. They obtained an additional, limited benefit if the total claims for any month did not reach the trigger-point amount. This situation was referred to as "favorable claims experience." Any amounts by which the aggregate level of claims was less than the trigger-point amount were carried forward to the next month, increasing the trigger-point amount for that month. However, there was no carryover from year to year. Further, the employers and Metropolitan anticipated a substantial reduction in premiums tax liability, expecting to calculate the tax solely on the basis of the reduced direct monthly payments to Metropolitan.

For the three tax years in question (1967-1969), Metropolitan urged that it was entitled to a 90 percent reduction in its tax liability as a consequence of the Mini-Met rider. The California Insurance Commissioner, unpersuaded by Metropolitan's position, levied a tax based upon the sum of the amounts employers paid to Metropolitan as premiums plus the aggregate yearly claims paid to employees from employers' funds. On October 29,

1973, Metropolitan paid $969,363.80 in tax assessments and interest.[1] After the State Board of Equalization (Board) rejected its claim, Metropolitan sued for a refund and obtained a judgment for the full amount requested. The Board appeals from the ruling.

■ The Legislature has defined insurance as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22.) Thus, insurance necessarily involves two elements: (1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons. (See *California Physicians' Service* v. *Garrison* (1946) 28 Cal.2d 790, 803-804 [172 P.2d 4, 167 A.L.R. 306]; 12 Appleman, Insurance Law and Practice (1981) § 7001, p. 4.)

That the employees are the insureds under employer-provided group health insurance plans cannot seriously be disputed. We plainly stated in *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 514, footnote 9 [63 Cal.Rptr. 35, 432, P.2d 731], that "the employee, in the tri-partite group insurance situation is the real insured under the policy." More generally, Insurance Code section 23 provides that "the person indemnified is the insured." Employee health plans cover the risk of injury or disability of the employees; the employees receive indemnification when such losses occur. That the employer may be the nominal policyholder is not significant; the employees remain those against whose potential loss the insurer provides indemnification.

Although willing to assume arguendo that the employees are the true insureds under the type of arrangement here at issue, Metropolitan nevertheless maintains that the employees are insureds of Metropolitan only to the limited extent of its "excessive risk" coverage. Metropolitan would have us characterize the Mini-Met plan as purely an excessive risk policy; Metropolitan asserts that the employers are separate insurers as to all employee claims aggregating less than the trigger-point amount. Thus, reasons Metropolitan, the cost of the employer-provided portion of the medical benefit coverage is not taxable as gross premiums because the employer is not an "insurer doing business in this state" within the meaning of the taxing provisions here at issue.[2] The Board counters with

---

[1]The parties have stipulated that Metropolitan is entitled to a judgment of refund in the amount of $12,690 plus $3,362.85 paid as interest, plus interest on both amounts as provided in Revenue and Taxation Code section 13107. The amount overpaid was the result of a typographical error in the tax assessment for 1968.

[2]Metropolitan cites *Cal-Western Ins. Co.* v. *St. Bd. of Equal.* (1957) 151 Cal.App.2d 559 [319 P.2d 19]. In that case, an employer had established an employee retirement plan, without insurance coverage. The employees contributed toward the plan through

the argument that Metropolitan was the sole insurer under the Mini-Met plan, bearing the entire insurance risk.

The Board relies heavily on *California Physicians' Service* v. *Garrison* (1946) *supra,* 28 Cal.2d 790, to support its position. The California Physicians' Service (CPS) was a nonprofit corporation formed to provide affordable health care coverage to low income persons. CPS collected monthly dues from the insureds, who were termed "beneficiary members" of the corporation; it distributed the dues to physicians—termed "professional members"—in payment for medical services rendered to the beneficiary members. The physicians had agreed to seek compensation solely from the fund created by dues collection. Thus, when the amount of dues collected in a particular month was insufficient to fully compensate all the physicians for their services, CPS would disburse to each physician a pro rata payment calculated according to the value of services rendered.

The main issue in *Garrison* was whether CPS was conducting an insurance business and therefore subject to statutes regulating insurers. Those statutes required, among other matters, maintenance of adequate financial reserves to guarantee that insurers would be able to fulfill their coverage obligations. We declined to subject CPS to the regulations applicable to insurance businesses, reasoning as follows: "The business of the Service lacks one essential element necessary to bring it within the scope of the insurance laws, for clearly it assumes no risk. Under the provisions of the contracts or group agreements, it is a mere agent or distributor of funds. . . . The professional member is compensated for his services solely from the fund created by the monthly dues of the beneficiary members. . . . Stated in terms of insurance, all risk is assumed by the physicians, not by the corporation. . . ." (*Id.,* at pp. 804-805.)

We explained and modified the *Garrison* holding in *People* ex rel. *Roddis* v. *Cal. Mut. Assn.* (1968) 68 Cal.2d 677 [68 Cal.Rptr. 585, 41 P.2d 97]. (See also *Maloney* v. *American I. M. & H. Assn.* (1953) 119 Cal.App.2d 319, 325 [259 P.2d 503].) California Mutual Association (CMA) was a nonprofit association organized to reimburse physicians and hospitals who rendered services to CMA's members. CMA financed its operation by collecting periodic dues from its members. Some of the physicians had agreed to look exclusively to CMA for payment of the

---

payroll deductions. Relying on the absence of a profit motive, the court held that the employer was not engaged in an insurance business and therefore was not subject to the gross premiums tax on the amount of employee contributions. (Accord, *Mutual Life Ins. Co. of N.Y.* v. *New York St. Tax Comm'n* (1973) 345 N.Y.S.2d 475 [32 N.Y.2d 348, 298 N.E.2d 632].)

scheduled fees. Other physicians provided services to CMA members without agreeing to seek reimbursement from any particular fund. As to this latter group of doctors, the patient-members were personally liable for payment of their medical expenses if CMA failed to meet its obligations. The issue in *Roddis,* as in *Garrison,* was whether CMA was an "insurer" and hence subject to statutory financial responsibility requirements or a mere "health care service plan" exempt from the statutory requirements. Noting that the purpose of the statutes was to protect insureds and the public, we reasoned that a health care provider should be required to maintain financial reserves only when there was some possibility that the provider, should it default, would leave the insureds subject to personal liability to physicians who had rendered services to them. We stated: "Where indemnity features are present, the member bears the risk of personal liability for medical services. This is the insurance risk which can be protected against by financial reserves to assure that the member will receive the benefits for which he has paid. . . . We, therefore, conclude that where indemnity is a significant financial proportion of the business, the organization must be classified as an 'insurer' for the purposes of the Knox-Mills Plan Act. . . . Although CMA's contracts with [the first group of] physicians provide for direct service without indemnity, the remainder of the plan is one of insurance." (*Id.,* at pp. 682-683.)

In their briefs, the parties have exhaustively discussed *Garrison* and *Roddis.* A careful review of those two cases, however, leads us to conclude that although they are generally helpful to an understanding of the nature of insurance and the need for financial stability of insurers, they bear only tangentially on the issues in the present case. The purpose of the taxing provisions which we interpret here is not to protect insureds, but rather to exact payments from insurers doing business in California; the gross premiums measure is apparently designed to approximate the volume of business done in this state, and thus the extent to which insurers have availed themselves of the privilege of doing business in California. (See generally *Ind. Indem. Exch.* v. *State Bd. Equalization* (1945) 26 Cal.2d 772, 775-776 [161 P.2d 222].)

The presence or absence of insurance risk on the part of the employers is not alone determinative of Metropolitan's tax liability. A more illuminating inquiry is whether the purpose of the taxing provisions can best be fulfilled by including amounts paid on pretrigger-point claims within the gross premiums measure of Metropolitan's tax. To myopically focus on the employers' status diverts attention from this central issue. In attempting to fulfill the purpose of the gross premiums tax, it is preferable to look beyond the formal labels the parties have affixed to their transactions and seek,

rather, to discern the true economic substance of the Mini-Met arrangement. We thus consider the insurance arrangement as a whole.

Insofar as *Garrison* and *Roddis* aid in the resolution of the issue here presented, they support the Board's argument that the employers under the Mini-Met arrangement functioned not as independent insurers but as "mere agent[s] or distributor[s] of funds." (*Garrison, supra,* 28 Cal.2d at p. 804.) Under the Mini-Met arrangement, Metropolitan retained control over many aspects of the administration of the total plan. Metropolitan determined the amount of all benefits to be paid in satisfaction of employee claims, both above and below the trigger-point, with the obligation to defend and the right to settle suits contesting rejection of claims. As to 13 of the 15 employers covered by the Mini-Met package, Metropolitan actually paid claims from the special accounts of the employers pursuant to authorization by the employers. Rather than paying the cost of group insurance directly to Metropolitan, these employers deposited the money into accounts under Metropolitan's control. The payments to employees from such accounts constituted an element of overall cost of the insurance package in the same manner as if those amounts had been paid to Metropolitan as "premiums" then forwarded to the employees by Metropolitan in satisfaction of the employee claims. For the purpose of calculating the gross premiums tax, we can discover no reasoned basis for distinguishing between the situation here presented and the former arrangement between Metropolitan and the employers. Metropolitan continued to derive substantially the same benefit of doing business in California and should logically have continued to incur the same tax liability.

True, the employers were primarily liable for payment of pretrigger-point claims. However, the obligations of Metropolitan were inextricably intertwined with those of the employers. If an employer failed to make funds available for payment of pretrigger-point claims in any month, Metropolitan remained obligated to cover the unpaid claims, subject to reimbursement from the delinquent employer.[3] The Mini-Met arrangement would then automatically terminate and the standard Metropolitan coverage would revert into effect at the end of the month in question. The employer

---

[3]We have not ignored Metropolitan's explanation that the provision in question was inserted "for administrative convenience to be certain that if there were a breakdown in communication or an inadvertent hiatus [in payments] on the part of the employer, the employees would get their checks without interruption." Metropolitan also points out that no employer has yet failed to pay a pretrigger-point claim. Neither of these facts, assuming them to be true, diminishes the effect of the clear legal liability of Metropolitan to make pretrigger-point payments if an employer should default for any reason, as, e.g., in the event of insolvency.

would then be liable to Metropolitan for a termination premium, equal to the total premiums which would have been payable to Metropolitan from the employer in the current policy year had the standard group policies remained in effect, less the sum of the Mini-Met premiums paid to Metropolitan in that year plus the claims actually paid to employees from employer funds in that year.

Furthermore, the employers had a fixed limit on the amount of funds they were obligated to make available in each month, a limit corresponding to the expected level of claims. Metropolitan thus bore the substantial insurance risk under the Mini-Met arrangement—the risk that the actual level of claims for a given month might exceed the predicted level. Given this highly entangled, symbiotic relationship between the employers and Metropolitan, it is hard to accept Metropolitan's contention that in providing funds for payment of pretrigger-point claims, the employers were discharging their independent liabilities as separate insurers.[4]

The Board persuasively argues that the employers role vis-á-vis the employees was that of an agent for the insurer. Metropolitan rebuts by citing the trial court's "finding of fact" that "[i]n making the medical benefit payments for which it was obligated, the employer was acting as principal, for its own account, and not as ageñt for Metropolitan Life Insurance Company." Metropolitan cites a number of general authorities for the proposition that whether an agency relationship exists is normally a question of fact. (See *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 831 [291 P.2d 915, 53 A.L.R.2d 124]; *Brokaw* v. *Black-Foxe Military Institute* (1951) 37 Cal.2d 274, 278 [231 P.2d 816].) It also cites cases holding that an employer is an agent of its employees when negotiating the terms of a group policy with the insurer. (See *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 705 [131 Cal.Rptr. 882, 552 P.2d 1178]; *Blos* v. *Bankers Life Co.* (1955) 133 Cal.App.2d 147, 150-151 [283 P.2d 744].) These cases are not apposite because a factual question becomes a question of law when the facts can be viewed in only one way. *Elfstrom* v. *New York Life Ins. Co.* (1967), *supra,* 67 Cal.2d 503, is controlling on the question of agency. In *Elfstrom*, we overturned the trial court's factual finding that the employer's bookkeeper was not an agent of the insurer; the bookkeeper had included an ineligible employee within group insurance coverage. Even though the insurance company itself did not know or have reason to know of the employee's ineligibility, the

---

[4]Metropolitan's contention that the employers are separate insurers bearing the bulk of the insurance risk under the Mini-Met plan is rendered less persuasive by its earlier admission in its claims for refund that "there was no risk in connection with the normal claims for activity for which the deductible amount [the trigger-point amount] was calculated."

knowledge of its agents—the bookkeeper and the employer—was inputable to the insurer. We held *as a matter of law* that "the employer is the agent of the insurer in performing the duties of administering group insurance policies." (*Id.,* at p. 512.) *Elfstrom* was recently reaffirmed in *Bass* v. *John Hancock Mut. Life Ins. Co.* (1974) 10 Cal.3d 792, 797-798 [12 Cal.Rptr. 195, 518 P.2d 1147]. (See also *Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 883 [103 Cal.Rptr. 865, 500 P.2d 889]; *Amberg* v. *Bankers Life Co.* (1971) 3 Cal.3d 973, 979 [92 Cal.Rptr. 273, 479 P.2d 633].)

An examination of the facts of this case leads us to the conclusion that the employers in this case, as in *Elfstrom*, acted as mere agents of an insurer. The function of the employers under the Mini-Met arrangement was extremely limited; 13 out of 15 employers did no more than to establish and fund, on a continuing basis, bank accounts out of which Metropolitan, by special authorization, disbursed benefit payments for employee claims aggregating less than the trigger-point amount in a particular month. The remaining two employers paid out benefits without the assistance of Metropolitan. Surely these activities fall within the ambit of "administration" of a group insurance policy and constitute doing business in California. Thus, the employers are to be treated as agents of Metropolitan, as a matter of law.

Having determined that there was but one insurer under the Mini-Met package and that the employers functioned as agents of the insurer, we arrive at the issue whether the pretrigger-point claims payments, although financed by the employers, should be included within the total amount on which Metropolitan must pay a gross-premiums tax. Several cases pertain to the more general question of what amounts are included within the meaning of the term "gross premiums." The initial authority is *Ind. Indem. Exch.* v. *State Bd. Equalization* (1945) *supra,* 26 Cal.2d 772, in which we held that a fee paid to attorneys at the expense of subscribers to an insurance exchange was included within the meaning of gross premiums because it was an element of the cost of the insurance.

*Groves* v. *City of Los Angeles* (1953) 40 Cal.2d 751 [256 P.2d 309], repeated the analysis of *Ind. Indem. Exch.* There, the agent of a bail bond insurer charged a percentage commission on the bonds he sold. A portion of the commission was forwarded to the principal, the agent retaining the remainder to cover expenses and as remuneration for his services. We held that the entire amount paid to the agent was includible within the gross premiums measure, not just the portion ultimately received by the bail bond company. Our reasoning went as follows: "[T]he basic theory is that the

amount paid by the insured for the insurance is the premium Here, as the bail agent is the insurer's agent, what he receives from the applicant for the insurance—that is, what the applicant pays for the bail bond is the premium. What the agent receives, in legal effect the insurer receives. The so-called 'fees' received by the bail agent do not result in a reduction of the cost to the insured." (*Id.*, at p. 761; accord, *Stuyvesant Insurance Co.* v. *State Tax Comm'n* (1972) 39 App.Div.2d 804 [332 N.Y.S.2d 314].) ·

The holding and principles of *Groves* were applied in *Allstate Ins. Co.* v. *State Board of Equal.* (1959) 169 Cal.App.2d 165 [336 P.2d 961]. There, the insurer charged a fee if the insured elected to make his payments in installments. The fee covered the additional expenses of the insurer occasioned by the need to collect multiple payments. The court required inclusion of the "installment payment fee" within the gross premiums measure, reasoning that a " '[p]remium' in the law of insurance means the amount paid to the company for insurance. [Citation.] It has been defined as 'the sum which insured is required to pay.' " (*Id.*, at p. 168.)

■ From the above cases we derive the general rule that the insurer is to be assessed a tax based on the total cost of the insurance coverage provided to the insured. Before applying this principle to the facts of the present case, we review some basic concepts relating to the calculation of insurance premiums. ■ "The gross premium, or the amount charged in a contract of insurance, ordinarily includes two elements, that is, the net premium and the loading. The loading, or the amount arbitrarily added to the net premium, is intended to cover the expenses of the company." (*Allstate Ins. Co.* v. *State Board of Equal.* (1959) *supra*, 169 Cal.App.2d at p. 168.) The net premium under standard group policies is the expected level of claims payments. The loading ordinarily is composed of miscellaneous charges, including administrative costs of the insurer, a charge for assuming the risk that claims outlays will exceed the expected level, and an element of profit or dividends. ■ Under the Mini-Met arrangement, the trigger-point amount is analogous to the net premium under a standard arrangement. As Metropolitan's expert testified, the second element of the cost of the Mini-Met plan, totalling 10 percent of its cost, is computed essentially by adding the costs of administration to a premium to compensate Metropolitan for assuming the risk that claims experience may fluctuate above the expected level or trigger-point. Thus, the amount the employers paid directly to Metropolitan under the Mini-Met plan—the only amount on which Metropolitan intended to pay a premiums tax—is analogous to the loading under a standard arrangement. To compute the total cost of the Mini-Met insurance package, we must add together the two elements of the premium, the net premium and the loading. Thus, the gross

premium is composed of the sum of the actual pretrigger-point claims payments and the amount paid directly to Metropolitan as premiums.

Metropolitan argues that part of the cost of the Mini-Met plan is paid by the employers, not by the employees. This argument is said to support Metropolitan's ultimate contention that only those amounts paid to Metropolitan by the employers should be taxed as gross premiums. However, we view the situation differently. As will appear, we conclude that the employees, as a practical matter, bear the full expense of insurance coverage. In financing payment of pretrigger-point claims, the employers act as mere agents of Metropolitan, accumulating funds to be disbursed in a manner inuring to the economic benefit of Metropolitan.

Only in a formalistic sense can it be said that the employers bear the cost of the benefit plans which they provide to their employees. Group insurance coverage is an element of the employees' compensation and fringe benefit package negotiated through the collective bargaining process. The labor of the employees is the true source of the benefits, which are a form of additional compensation to them.[5] We fully concur in the following passage from *Insurance Co. of North America* v. *Bechtel* (1973) 36 Cal.App.3d 310 [111 Cal.Rptr. 507]: "Since the employer's contribution to the premium on group insurance is a fringe benefit, whether it be the full amount of the premium or only part of it, the extent of premium paid by the employer is not controlling. There is no practical difference between a pay raise to an employee out of which he pays part of the premium on his group insurance and direct payment of the premium by the employer." (*Id.,* at p. 317.) Although the court was addressing a different issue, the logic of its reasoning applies equally to the facts of the present case. ▮ The tax liability of an insurer should not depend on the bare formality of whether the employer pays the cost of benefits out of his own pocket or negotiates a pay raise with his employees, then deducts the cost of the plan from their salaries and forwards those amounts to the insurer. In both situations, the insurer obtains the same benefit of doing insurance business in this state. Accordingly, we hold that the entire cost of an employee benefit plan, whether paid from the employer's funds or financed by deductions from the

[5]*Teamsters* v. *Daniel* (1979) 439 U.S. 551 [58 L.Ed.2d 808, 99 S.Ct. 790], cited by Metropolitan, does not compel a contrary result. There the court was considering whether employer contributions to a pension plan on an employee's behalf should be treated as an investment by the employee in a security. The court stated "Only in the most abstract sense may it be said that an employee 'exchanges' some portion of his labor in return for these possible benefits." (*Id.,* at p. 560 [58 L.Ed.2d at p. 817].) Viewed in context, the above-quoted statement does not contradict or even relate to our holding that employees are to be treated as the persons who finance employer-provided benefit plans for purposes of our state premiums tax.

salaries of employees, is taxable as gross premiums inuring to the benefit of the insurer.

Applying this rule to the facts of the instant case, we hold that Metropolitan is taxable on the sum of the premium payments it received from the employers and the pretrigger-point claims paid from employer funds in the tax years in question.

The judgment is reversed and the case remanded to the trial court with directions to enter judgment for Metropolitan only in the amount of the erroneous assessment described in footnote 1, *ante*.

Bird, C. J., Broussard, J., and Miller, J.,* concurred.

**KAUS, J.,** Dissenting.—Article XIII, section 28 of the California Constitution imposes a tax on (1) gross *premium*, (2) *received* by (3) an *insurer*. The majority imposes this tax on (1) *losses* (2) *paid* to (3) *doctors and hospitals* and the like. What went wrong?

I might join the majority if there were any evidence that the Mini-Met plan is just a bookkeeping trick by which Metropolitan intercepts 90 percent of the premiums at the source and, instead of running the money through its own books, causes it to be paid out directly to cover losses which Metropolitan would inevitably have incurred under the pre-Mini-Met arrangement. This kind of tax evasion could have been attempted by setting the trigger-point at an unrealistically low figure so that—barring a series of medical miracles—the actuarial possibility that the employers would actually save money by not having to disburse funds up to the trigger-point was nil. The fact—not mentioned in the majority opinion—is exactly the opposite: the record shows that in many months actual payments were well below the trigger-point *and that in 32 out of 42 policy years examined the total payments did not reach the trigger-point.*[1] Thus it cannot be contended that all the Mini-Met rider achieved was a fictitious reclassification of the first 90 percent of premium income as a deductible loss. Rather, the effect of the rider was just what it purported to be: it

---

*Assigned by the Chairperson of the Judicial Council.

[1] The majority is therefore quite unjustified in saying that "[f]or the purpose of calculating the gross premiums tax, we can discover no reasoned basis for distinguishing between the situation here presented and the former arrangement between Metropolitan and the employers." (*Ante,* p. 657.) Is there no reasoned basis for distinguishing between payment for the actual cost of a small loss and payment of a premium for an actuarially anticipated greater loss?

converted the pre-1967 full coverage policy into a genuine policy of excess insurance—quite similar to the deductible collision coverage most of us carry on our automobiles. If a motorist carries $100 deductible collision coverage and pays out $85 for a minor repair, no one can rationally claim that he is paying a premium, rather than a loss.[2]

It is a safe guess that if Metropolitan and the employers had started to do business under the Mini-Met rider, the board would never have attempted the impossible: to convert excess insurance into full coverage. It is only because Metropolitan and the employers, for perfectly legitimate business reasons, changed plans in a way which resulted in considerable premium savings, that the board developed fancy theories to recoup its losses in tax revenue.[3] Yet all the evidence is to the effect, and the trial court expressly found, that "Mini-Met was not developed as a tax avoidance device. It was an excess insurance arrangement developed to effect, and did effect, substantial and bona fide changes in the financial, economic, contractual and legal relationships among Metropolitan, the employers and the employees from those existing under a full coverage insurance policy." The court further found that the impetus for the change from full coverage to Mini-Met came from the employers who "developed an increased awareness of the importance of 'cash-flow' management and investment of corporate funds." Some employers even considered 'shifting to non-insurance. It was only when faced with this loss of business that Metropolitan reluctantly started to offer the so-called "Met-Cat" plan, Mini-Met's predecessor. The trial court therefore concluded, after reiterating that Mini-Met was "not a tax avoidance scheme lacking in substance," that "it was 'compelled by business realities' and 'imbued with tax-independent considerations.'" While the business considerations which caused a genuine economic demand for a type of excess insurance such as Mini-Met are fairly set forth in the majority opinion, their significance becomes quickly lost in what I respectfully submit to be an irrelevant detour into the law of agency.

---

[2] "'Premium' in the law of insurance means the amount paid to the company for insurance." (*Allstate Ins. Co.* v. *State Board of Equal.* (1959) 169 Cal.App.2d 165, 168 [336 P.2d 961].) As a former Attorney General said of an insured's payment of the deductible portion of a loss: "Obviously this is not the price of any insurance and is in no sense a 'premium.'" (48 Ops.Cal.Atty.Gen. 49, 53 (1966).)

[3] The New York authorities were more generous. Part of the record before us is a letter opinion from the New York Attorney General, dated December 27, 1966. In reply to a request for an opinion concerning the effect of Tax Law section 187 on what eventually became the Mini-Met rider, it said: "In my opinion, the amount of benefits paid out by employers to employees are in no sense a 'premium' received by the insurer and are therefore not taxable to the insurer under § 187."

664

The basic fallacy of the majority opinion is revealed at its outset. It says that "[b]ecause we conclude that under the [Mini-Met] arrangement the employer *is a mere agent of Metropolitan for collection of premiums,* not an independent insurer,[4] we attribute the entire cost of the group plan to Metropolitan's gross premiums . . . ." (Italics added; *ante,* p. 652.) In support of its agency theory, the majority relies heavily on *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503 [63 Cal.Rptr. 35, 432 P.2d 731], a case which in my view is not even remotely in point. That case held only that when an employer erroneously extends coverage to an employee who is not eligible for insurance, the insurer is bound by the employer's mistake because "the employer is the agent of the insurer in performing the duties of administering group insurance policies" vis-à-vis the insured employees. (*Id.,* at p. 512; accord, *Bass* v. *John Hancock Mut. Life Ins. Co.* (1974) 10 Cal.3d 792, 797-798 [112 Cal.Rptr. 195, 518 P.2d 1147]; *Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 883 [103 Cal.Rptr. 865, 500 P.2d 889]; *Amberg* v. *Bankers Life Co.* (1971) 3 Cal.3d 973, 979 [92 Cal.Rptr. 273, 479 P.2d 633].) *Elfstrom* did not purport to hold that an employer is the agent of an insurer—as a matter of law—*for all purposes,* and it certainly did not decide that payments made by an employer to its employees' health providers from its own funds in payment of its own contractual obligations should invariably be treated as gross premiums of an insurer which receives a different premium for covering a different risk. To say, as the majority does, that the employers in this case somehow "administered" Metropolitan's policy—á la *Elfstrom* —by paying pretrigger-point losses assumes the point to be proven: that these payments were not what they appeared to be, namely the employers' own losses, but payments to satisfy an obligation which Metropolitan had assumed by receiving a premium therefor, namely the payment made by the employers. The self-levitating nature of this argument is evident.

In contrast to the majority's conclusion, the trial court found that "in making the medical benefit payments for which it was obligated, the employer was acting as principal, for its own account, and not as agent of Metropolitan . . . ." The record not only justifies but compels that finding. As noted in the majority opinion two employers paid benefits below the trigger-point without any assistance by Metropolitan. Actually, out of a total of about $33 million of payments in issue, these two employers accounted for

[4]The majority seems to suggest that unless the employers are "insurers" for pretrigger-point losses, Metropolitan necessarily assumes that role. I disagree. The employers are simply fulfilling their contractual obligations toward their employees. If, in doing so, they run afoul of an unspecified part of the Insurance Code or some other law, that is another lawsuit. It certainly does not turn funds disbursed by them into premiums received by Metropolitan.

over $24 million—about 73 percent! How payments made by those two employers to satisfy their own obligations toward their own employees can be tortured into acts which "fall within the ambit of 'administration' of a group insurance policy" (*ante,* p. 659) is simply beyond me.

Legally the situation is no different as far as the other 13 companies are concerned. It will be recalled that they placed funds into accounts on which Metropolitan was permitted to draw in payment of claims below the trigger-point—payments for which the employers were responsible. Testimony at the trial described the arrangement as follows: "Generally a special bank account is set up where the employer wants the Metropolitan *to provide the claim service* on his liability, claim service being actually paying the claims . . . and he sets up a special bank account so that we can draw a draft on his account for the payment of his benefit, for the payment of his liability." (Italics added.)[5] Naturally, where the insurance company has excess exposure for which it receives a premium, the cost of providing this claim service for losses below the excess is calculated into the premium, but the tax ·on that premium which Metropolitan concededly "received," is not at issue here. What the majority fails to explain is how Metropolitan's furnishing this type of claim service for funds which it has not, and never will, receive, justifies treating all of these funds of the employer as gross premiums received by Metropolitan. In any event, as to these 13 employers, it is obviously Metropolitan who is administering the employers' funds, and not—as the majority apparently claims—vice versa. I simply cannot understand how putting money into a bank account and watching it dwindle amounts to administering Metropolitan's policy.[6]

Having satisfied itself that the employers were agents of Metropolitan, the majority faces its biggest challenge—"the issue whether the pre-.trigger-point claims payments, although financed by the employers, should be included within the total amount on which Metropolitan must pay a gross-premiums tax." (*Ante,* p. 659.) It then analyzes several cases such as *Groves* v. *City of Los Angeles* (1953) 40 Cal.2d 751 [256 P.2d 309] to establish that the gross premium may include certain charges such as attorneys fees (*Ind. Indem. Exchange* v. *State Bd. of Equalization* (1945) 26 Cal.2d 772 [161 Cal.Rptr. 222]), commissions (*Groves, supra*), or an "installment payment fee." (*Allstate Ins. Co.* v. *State Board of Equal.*

[5]Testimony also revealed that employers who have no insurance at all can "rent" the claim service of an insurance company on an "ASO"—administrative services only —basis.

[6]The curious thing about the majority opinion is that it reaches its conclusion that "the employers are to be treated as agents of Metropolitan as a matter of law" just a few lines after correctly pointing out that the "function of the employers under the Mini-Met arrangement was extremely limited; . . ." (*Ante,* p. 659.)

(1959) 169 Cal.App.2d 165, 168 [336 P.2d 961].) Then, taking off from a statement in *Allstate* that premium rates are based on the expected losses ("pure premium") and expenses ("loading"), the majority jumps to the untenable conclusion that "[u]nder the Mini-Met arrangement, the trigger-point amount is analogous to the net premium under a standard arrangement." (*Ante*, p. 660.) In other words, the premium which the employers do *not* pay is really part of the net premium received by Metropolitan! Obviously this argument too simply assumes the result it strives to reach: that the employers are insured up to the trigger-point and that when they pay a pretrigger-point loss, they are really paying a premium.[7]

Even so, the majority is not out of the woods. After all the taxable event is the *receipt* of premiums by Metropolitan—as is recognized at the outset of the opinion by the statement that the court reverses because "the employer is a mere agent of Metropolitan for the *collection* of premiums . . . ." (*Ante*, p. 652; italics added.) So far all we have seen the employer do is pay out losses—either on its own account, as the trial court found, or on behalf of Metropolitan, as the majority asserts. Not one penny of premiums has so far been collected for pretrigger-point "coverage."

The majority gets over this final hurdle by holding that the premium is collected by the employers when they receive the labor of the insured employees. "The labor of the employees is the true source of the benefits . . . ." (*Ante*, p. 661.) The only trouble with that theory is that the tax claimed by the board has nothing to do with the value of the labor rendered by the insureds. To the contrary, the board asserts that the *losses paid* are the measure of the tax liability. Obviously when one deals with a medical benefit plan, these should be in inverse proportion to the value of the labor rendered.

It is therefore submitted that the board's effort to transform an excess policy into one that provides full coverage will not stand up. It remains to dispose of a couple of points made by the majority to assert by implication that the "symbiotic" relationship between Metropolitan and the employers can somehow make the legal realities disappear.

First, there is the point that if the 13 employers who did avail themselves of Metropolitan's claims service failed to provide sufficient funds for

---

[7]What about the premium savings in the 32 policy years when losses did not reach the trigger-points? Presumably the employers owe these funds to Metropolitan and, to be consistent, the board should claim that they are gross receipts. One can only speculate why it lacked the requisite chutzpah.

pretrigger-point losses, Metropolitan was nevertheless obligated to advance money to pay for the losses, subject to reimbursement by the employers—a clean debtor-creditor relationship which by no means turns Metropolitan from a creditor into an insurer. The fact that an employer may become insolvent and leave Metropolitan holding the bag is a normal risk of doing business which was, presumably, taken into account in calculating the "loading" portion of the premium for the excess coverage, on which Metropolitan concedes that it was properly taxed. In any event, the argument has no application to the two employers who handled their own claims and whose payments comprised about 73 percent of the $33 million total.

Second, the majority points to the fact that Metropolitan "determined the amount of all benefits to be paid in satisfaction of employee claims, both above and below the trigger-point, with the obligation to defend and the right to settle suits contesting rejection of claims." (*Ante,* p. 657.) There is, of course, nothing unusual in that kind of arrangement. Metropolitan's obligations under it are simply part of the "administrative services" which it rendered to the employers; its rights derive from the fact that it is, after all, an excess insurer and has a vital interest in making certain that the excess risk it insured is not prematurely triggered by payment of unjustified, uninsured losses. Metropolitan's primary power to determine the extent of pretrigger-point losses is obviously subject to a covenant of good faith and fair dealing. (See *Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.* (1979) 90 Cal.App.3d 786, 792-793 [153 Cal.Rptr. 678]; cf. *Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 921 [164 Cal.Rptr. 709, 610 P.2d 1038].)

I would affirm.

Reynoso, J., and Barry-Deal, J.,* concurred.

Respondent's petition for a rehearing was denied November 29, 1982. Richardson, J., and Newman, J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.